# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Dr. Gregory Sherr,

        Plaintiff,

    v.

HealthEast Care System, CentraCare Health,
Dr. Margaret Wallenfriedman, Dr. Mary Beth Dunn,
Dr. Richard Gregory, Dr. Stephen Kolar,
Dr. Jerone D. Kennedy, and Archie Defillo,

        Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 16-3075 ADM/LIB

---

Lawrence P. Schaefer, Esq., and Peter Christian, Esq., Schaefer Halleen, LLC, Minneapolis, MN, on behalf of Plaintiff.

Daniel Falknor, Esq., and William R. Stoeri, Esq., Dorsey & Whitney LLP, Minneapolis, MN, on behalf of Defendants HealthEast Care System, Dr. Margaret Wallenfriedman, Dr. Mary Beth Dunn, Dr. Richard Gregory, and Dr. Stephen Kolar.

John L. Greer, Esq., Hughes Mathews Greer, P.A., St. Cloud, MN, on behalf of Defendants CentraCare Health, Dr. Jerone D. Kennedy, and Archie Defillo.

---

## I. INTRODUCTION

On April 11, 2017, the undersigned United States District Judge heard oral argument on Defendants HealthEast Care System ("HealthEast"), Dr. Margaret Wallenfriedman ("Dr. Wallenfriedman"), Dr. Mary Beth Dunn ("Dr. Dunn"), Dr. Richard Gregory ("Dr. Gregory"), and Dr. Stephen Kolar's ("Dr. Kolar") (collectively, the "HealthEast Defendants") Motion for Partial Judgment on the Pleadings [Docket No. 24] and Defendants CentraCare Health ("CentraCare"), Dr. Jerone D. Kennedy ("Dr. Kennedy"), and Archie Defillo's ("Defillo") (collectively, the "CentraCare Defendants") Motion for Judgment on the Pleadings [Docket No.

28].  Plaintiff Dr. Gregory Sherr ("Dr. Sherr") opposes the Motions.  For the reasons discussed below, the Motions are granted.

## II.  BACKGROUND[1]

Dr. Sherr, a neurosurgeon, alleges that Defendants conspired to eliminate him as a competitor for neurosurgery patients in both the Minneapolis-St. Paul, Minnesota ("Twin Cities") and the St. Cloud, Minnesota markets.  First Am. Compl. ("FAC") [Docket No. 15] ¶ 3.  Dr. Sherr alleges that Defendants colluded to initiate complaints against him during HealthEast's physician peer review process and improperly secured a summary suspension of his privileges at St. Joseph's Hospital ("SJH"), a HealthEast hospital in St. Paul.  Id. ¶¶ 3, 8, 47, 54, 68, 73.  Within days of the summary suspension, Defendants allegedly spread word to the tight-knit neurosurgery community of Sherr's suspension, destroying his reputation in Minnesota and forcing him to move to another state to continue his career.  Id. ¶¶ 4, 76, 77, 82–83.

Dr. Sherr asserts the following claims:  breach of peer review confidentiality under Minn. Stat. § 145.64; common law invasion of privacy; defamation; tortious interference with prospective economic advantage; tortious interference with contract; and violation of federal and state antitrust statutes.  Defendants move for judgment on the pleadings as to the breach of peer review confidentiality claim, the invasion of privacy claim, and all antitrust claims.  The remaining claims survive.

---

[1] All facts are taken from Sherr's First Amended Complaint [Docket No. 15] and are assumed true.  Poehl v. Countrywide Home Loans, Inc., 528 F.3d 1093, 1096 (8th Cir. 2008).

## A. Parties

### 1. Plaintiff

Dr. Sherr is a Florida resident and licensed neurosurgeon specializing in treating high-risk patients with poor self-care histories.  FAC ¶¶ 19, 25.

### 2. HealthEast Defendants

HealthEast is a non-profit health care provider and hospital management company headquartered in St. Paul, Minnesota.  Id. ¶ 8.  HealthEast owns four hospitals including SJH. Id.  Drs. Wallenfriedman, Dunn, and Gregory are Minnesota residents and licensed neurosurgeons employed at HealthEast.  Id. ¶¶ 10–12.  Dr. Kolar is a Minnesota resident and licensed internal medicine physician who served as HealthEast's Senior Vice President and Chief Medical Officer in 2015.  Id. ¶ 13.

### 3. CentraCare Defendants

CentraCare is a non-profit health care provider headquartered in St. Cloud, Minnesota with locations throughout central Minnesota.  Id. ¶ 9.  CentraCare owns and operates six hospitals including Saint Cloud Hospital ("SCH").  Id.  Dr. Kennedy is a Minnesota resident and licensed neurosurgeon employed at CentraCare.  Id. ¶ 14.  Defillo is Minnesota resident and an administrator at CentraCare.  Id. ¶ 15.  He serves as the Clinical Director of Neurosciences at SCH.  Id.

## B. Factual Background

### 1. Dr. Sherr Begins Neurosurgery Career

Dr. Sherr graduated from medical school in 2004, completed a neurosurgery fellowship and residency in 2010, and joined Central Minnesota Neurosciences ("CMN"), an independent

neurosurgery practice serving patients in the St. Cloud area, in 2011.  Id. ¶¶ 19–20.  He was granted privileges to practice as an attending physician SCH in St. Cloud and at SJH in St. Paul. Id. ¶ 20.  Dr. Sherr remained with CMN until late December 2014, when CMN was purchased by CentraCare.  Id. ¶¶ 23–24.

**2. Dr. Sherr Joins Minnesota Spine & Brain Institute and Opens St. Cloud Clinic**

In January 2015, Dr. Sherr joined the Midwest Spine & Brain Institute ("MSBI"), which was known as the Midwest Spine Institute until Dr. Sherr was hired and the practice was expanded to include cranial neurosurgery.  Id. ¶¶ 26–27.  At the time Dr. Sherr was hired, MSBI operated clinics in Apple Valley, Burnsville, Elk River, Golden Valley, Maple Grove, Maplewood, Minnetonka, Princeton, and St. Anthony, Minnesota as well as in New Richmond and St. Croix Falls, Wisconsin.  Id. ¶ 28.

Upon joining MSBI, Dr. Sherr opened a MSBI neurosurgery clinic in St. Cloud, two blocks away from SCH.  Id. ¶ 37.  He staffed the St. Cloud clinic with his former administrative team from CMN and added a neurosurgeon, Dr. David Chang.  Id. ¶¶ 35, 37, 39.  The group was well connected and familiar with the patient base and referral sources in the St. Cloud area, and the clinic was soon operating very successfully.  Id. ¶ 37.

During the 15 months that Dr. Sherr practiced with MSBI, he maintained privileges at numerous hospitals, including SCH in St. Cloud and SJH, Fairview Southdale, North Memorial Medical Center, and United Hospital in the Twin Cities.  Id. ¶ 29.  He performed approximately 500 surgical cases during this time period, including approximately 140 surgeries at SJH.  Id. ¶ 30.  The majority of the surgeries were complex reconstructive spine surgeries, often for low income, high-risk patients struggling with obesity, poor health habits, or other conditions such as

diabetes.  Id.

### 3. Dr. Sherr and MSBI Compete with CentraCare, HealthEast

Dr. Sherr alleges that the opening of the MSBI St. Cloud clinic posed a significant threat to CentraCare and its ability to attract neurosurgery patients at SCH.  Id. ¶ 39.  According to Dr. Sherr, Dr. Kennedy and Defillo were "deeply disturbed by the establishment of the successful MSBI Neurosurgery Clinic two blocks from SCH, which was dramatically affecting revenues for neurosurgery practice at SCH."  Id. ¶ 44.  Dr. Sherr also alleges that MSBI's addition of Drs. Sherr and Chang to its neurosurgery staff threatened HealthEast's ability to attract and retain the majority of neurosurgery patients who were treated at SJH in St. Paul.  Id. ¶ 39.

In February 2015, Drs. Wallenfriedman, Dunn, and Gregory moved their neurosurgery practice from United Hospital, where they had practiced together for more than ten years, to HealthEast, where they became known as the "HealthEast Neuro Group."  Id. ¶¶ 33, 41–42.  In negotiating this transition, the group initially stated that they would not move their practice to HealthEast unless HealthEast discontinued all use of MSBI physicians for neurosurgery and spine care and removed any MSBI clinic presence from HealthEast.  Id. ¶ 42.  HealthEast executives denied this request but asked MSBI to agree that MSBI physicians would no longer be "on call" in the SJH and St. Joseph's emergency rooms for neuro or spine cases.  Id. ¶ 43.  HealthEast also asked MSBI to agree that MSBI physicians would not perform "elective procedures" at HealthEast facilities, but MSBI refused.  Id.  Although Drs. Wallenfriedman, Dunn, and Gregory were unable to get HealthEast to agree to all of their demands, the group joined HealthEast based on assurances that HealthEast would not make neurosurgery referrals to MSBI.  Id.

**4. Defendants Allegedly Conspire to Eliminate Dr. Sherr and MSBI as Competitors**

Soon after joining HealthEast, the HealthEast Neuro Group "began a concerted attack . . . to eliminate MSBI neurosurgeons from practicing at HealthEast." Id. ¶ 44. Dr. Sherr alleges "[u]pon information and belief" that the HealthEast Neuro Group "enlisted the participation of [CentraCare's] Dr. Kennedy and Defillo in this plan, as these physicians shared the goal of eliminating Dr. Sherr and MSBI as competitors." Id. "Upon information and belief," Dr. Sherr asserts that Dr. Kennedy and the physicians in the HealthEast Neuro Group were "close friends" because Dr. Kennedy had practiced at United Hospital with them for ten years until Dr. Kennedy's resignation from United Hospital in 2012. Id. ¶ 33.

Dr. Sherr alleges that Dr. Kennedy and Defillo "made no attempt to hide their disdain for Dr. Sherr and MSBI, their anger over his clinic, or their intent to destroy his practice." Id. ¶ 46. For example, shortly after MSBI's St. Cloud clinic opened, Dr. Sherr was informed by physicians in the St. Cloud area that Defillo had threatened them "by stating that if they continued to refer patients to Dr. Sherr at the MSBI clinic, Defillo would ensure their SCH practice would suffer. Defillo informed one such physician that he would be denied 'block time' to follow up with his patients at SCH, which would essentially preclude him from practicing at SCH." Id. ¶ 45. The HealthEast Neuro Group similarly expressed their disdain for Dr. Sherr by regularly complaining to SJH operating room nurses about the significant block time Dr. Sherr's surgery practice consumed on the SJH operating room calendar. Id. ¶ 48.

Dr. Sherr alleges "[u]pon information and belief" that "Defillo and Dr. Kennedy began to communicate, orally and in writing, with the HealthEast Neuro Group and other individuals in the neurosurgeon [sic] community, specifically about the shared desire to force Dr. Sherr out of

practicing neurosurgery in Minnesota." Id. ¶ 46.

Defendants' plan to remove Dr. Sherr as a competitor for neurosurgery patients in the Twin Cities and St. Cloud allegedly involved:  gaining control of HealthEast's physician peer review committee (the "Spine Council"), which addresses complaints about physician care; generating complaints to the Spine Council about Dr. Sherr's care in eight patient cases; making false statements at the Spine Council meetings to persuade Dr. Kolar (HealthEast's Chief Medical Officer and "upon information and belief" a close friend of Dr. Gregory) to issue a summary suspension of Dr. Sherr's HealthEast privileges; convincing the Spine Council to unanimously vote to approve Dr. Kolar's decision to summarily suspend Dr. Sherr's privileges; and obtaining the HealthEast Medical Executive Committee's ("MEC") approval of the suspension. Id. ¶¶ 52–59, 68–71, 73.

### 5. HealthEast Conducts Peer Review Proceedings, Issues Summary Suspension

It is alleged that Dr. Wallenfriedman arranged to have herself nominated as one of three candidates for the position of chairperson of the Spine Council. Id. ¶ 52.  A vote regarding the candidates was scheduled for the September 2015 Spine Council meeting. Id. ¶ 53.  The other two candidates (one of whom was Dr. Sherr's partner at MSBI) did not attend the scheduled meeting and expected that the vote would be delayed until the next meeting. Id.  Instead, at the September meeting "Dr. Wallenfriedman was simply placed into this role [of chairperson], apparently without a vote, in direct violation of the HealthEast Bylaws." Id.

With Dr. Wallenfriedman acting as chairperson, the Spine Council met on October 6, 2015, to discuss eight of Dr. Sherr's patient care cases. Id. ¶ 57.  Dr. Sherr believes that in two of the cases the complaints originated from the HealthEast Neuro Group. Id. ¶ 56.  At the

meeting, the HealthEast Neuro Group made "scores of false and malicious statements." <u>Id.</u> ¶ 62. The Spine Counsel reached a consensus at the conclusion of the meeting that MSBI would develop a corrective action plan to reduce the risk of infections to Dr. Sherr's patients and would present the plan at a future Spine Council meeting. <u>Id.</u> ¶¶ 63–64.

Dr. Wallenfriedman unilaterally scheduled the future meeting for October 20, 2015 and did not notify MSBI's president of the meeting. <u>Id.</u> ¶ 65. At the October 20, 2015 meeting, Dr. Kolar decided to summarily suspend Dr. Sherr's privileges, and the Spine Council unanimously voted to uphold Dr. Kolar's decision. <u>Id.</u> ¶ 68. The MEC then met on October 22, 2015 and voted to approve Dr. Sherr's summary suspension. <u>Id.</u> ¶¶ 71, 73.

Dr. Sherr was informed of his summary suspension on October 20, 2015, after the suspension had been upheld by the Spine Council but before it had been approved by the MEC. <u>Id.</u> ¶ 71. At the time he was notified, Dr. Sherr and his surgical team were readying two patients for surgery in the HealthEast pre-operation unit. <u>Id.</u> Dr. Sherr was forced to cancel both surgeries, to the dismay of the patients and to his public humiliation. <u>Id.</u> However, one of the patients was transferred to a non-HealthEast hospital where Dr. Sherr was able to perform the surgery later that evening, and the other patient's surgery was completed on another date at a different facility. <u>Id.</u> ¶ 72.

### 6. Dr. Sherr's Confidential Summary Suspension is Disclosed to Others

Although Minnesota law prohibits disclosure of matters that transpire at a peer review meeting, within days of his summary suspension, individuals outside of the peer review process were aware of Dr. Sherr's suspension. <u>Id.</u> ¶¶ 77, 80, 82–83; Minn. Stat. § 145.64. Specifically, Doug Mackay, a sales representative with Stryker Spine, was informed of the confidential

summary suspension by a coworker who had learned of the suspension from the SCH neurosurgeons.  FAC ¶ 77.  Additionally, Tom O'Connor ("O'Connor"), president of United Hospital, called MSBI's president to inform him that Dr. Sherr's summary suspension would "directly and adversely affect the willingness of United Hospital and Allina-affiliated neurosurgeons (who were also aware of this suspension), to make any referrals to Dr. Sherr or MSBI."  Id. ¶ 80.  According to Dr. Sherr, O'Connor "directly inferred" in the telephone conversation that O'Connor was informed of the suspension by the HealthEast Neuro Group because he stated without prompting that the group had "sharp elbows" and would use any means at their disposal to eliminate potential competitors.  Id. ¶ 82.  Dr. Sherr was also informed by a credentialing specialist at Fairview Southdale hospital that the hospital was aware of Dr. Sherr's summary suspension at HealthEast and SJH.  Id. ¶ 83.  Fairview Southdale required Dr. Sherr to provide a letter of explanation from a practicing neurosurgeon at HealthEast before it would re-credential him, which he did.  Id.

Dr. Sherr also received a text from Defillo in December 2015 informing Dr. Sherr of an employment opportunity in Dubai and describing the opportunity as an "excellent way to rebuild [Sherr's] career."  Id. ¶ 79.  Although this text does not reference Dr. Sherr's suspension, Dr. Sherr alleges that he was "stunned" by the text because "Defillo at that time would have no legitimate reason to even be aware of any suspension of Dr. Sherr, much less any 'need to rebuild his career,' apart from improper disclosures by those involved in the [peer review] process."  Id.

### 7.  Dr. Sherr Resigns from MSBI, Moves to Florida

Dr. Sherr appealed his summary suspension to the HealthEast Judicial Review

Committee and succeeded in having the summary suspension reversed on February 4, 2016.  Id. ¶¶ 85, 88.  Although he prevailed on appeal, Dr. Sherr alleges that the widespread public disclosure of the summary suspension devastated his referral sources and damaged his reputation.  Id. ¶ 89.  MSBI informed him that it could not continue to retain him as a physician employee.  Id.  Dr. Sherr agreed to resign from MSBI and was forced to accept employment with a neurosurgery group in Florida, where he is now located.  Id. ¶ 90.

Dr. Sherr alleges that in addition to harming him, Defendants' conduct caused significant harm to the care of neurosurgery patients in the Twin Cities and St. Cloud Communities because these patients "have been deprived of Dr. Sherr's innovative and expert care, and are instead forced to accept treatment from the . . . physician Defendants, who have, individually and collectively, nowhere near the expertise and innovative skills and techniques Dr. Sherr brings to this critically needed area of medical care."  Id. ¶ 6.

### III. DISCUSSION

#### A. Motion for Judgment on the Pleadings Standard

In considering a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure, the court views "all facts pleaded by the nonmoving party as true and grant[s] all reasonable inferences in favor of that party."  Poehl, 528 F.3d at 1096.  Judgment on the pleadings is appropriate "where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law."  Faibisch v. Univ. of Minn., 304 F.3d 797, 803 (8th Cir. 2002).  This is the same standard used to resolve a motion to dismiss under Rule 12(b)(6).  Ashley Cty., Ark. v. Pfizer, Inc., 552 F.3d 659, 665 (8th Cir. 2009).

To survive Rule 12 scrutiny, a plaintiff's factual allegations must "raise a right to relief

above the speculative level," and push claims "across the line from conceivable to plausible."

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007). In other words, the complaint must

establish more than a "sheer possibility that a defendant has acted unlawfully." Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). However, a court "must not

presume the truth of legal conclusions couched as factual allegations," and should "dismiss

complaints based on 'labels and conclusions, and a formulaic recitation of the elements of a

cause of action.'" Hager v. Ark. Dept. of Health, 735 F.3d 1009, 1013 (8th Cir. 2013) (quoting,

in part, Twombly, 550 U.S. at 555); see also Retro TV Network, Inc. v. Luken Commc'ns, LLC,

696 F.3d 766, 768 (8th Cir. 2012) ("Conclusory statements and naked assertions devoid of

further factual enhancement are insufficient.") (quotations and alterations omitted).

**B. Breach of Peer Review Confidentiality Under Minn. Stat. § 145.64 (Count I)**

Dr. Sherr asserts a claim against the HealthEast Defendants for breach of peer review

confidentiality under Minn. Stat. § 145.64. This claim is based on allegations that the

HealthEast Defendants disclosed confidential information from the peer review meeting. Dr.

Sherr further alleges that the HealthEast Defendants were motivated by malice in disclosing the

confidential information. The HealthEast Defendants argue that this claim must be dismissed

because Minn. Stat. § 145.64 does not provide a private cause of action.

Minnesota's statutes governing peer review are embodied in Minn. Stat. § 145.61

through § 145.66. Dr. Sherr's claim derives from the language in Minn. Stat. § 145.64,

addressing confidentiality of peer review information. This statute makes it unlawful to

"disclose what transpired at a meeting of a review organization except to the extent necessary to carry out one or more of the purposes of a review organization."  Minn. Stat. §  145.64.  The penalty for prohibited disclosures is set forth in Minn. Stat. § 145.66, which provides:  "Any disclosure other than that authorized by section 145.64, of data and information acquired by a review committee or of what transpired at a review meeting, is a misdemeanor."

"A statute does not give rise to a civil cause of action unless the language of the statute is explicit or it can be determined by clear implication."  Becker v. Mayo Found., 737 N.W.2d 200, 207 (Minn. 2007).  "It is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."  Id. (quoting Transamerica Mortg. Advisors, Inc. v. Lewis, 444 U.S. 11, 19 (1979)).  Consistent with this principle, the Minnesota Supreme Court has repeatedly refused to recognize a private cause of action under statutes that explicitly impose criminal or civil penalties but are silent regarding a private cause of action.  See, e.g., Graphic Commc'ns Local 1B Health & Welfare Fund "A" v. CVS Caremark Corp., 850 N.W.2d 682, 691 (Minn. 2014); Becker, 737 N.W.2d at 208–09; Larson v. Dunn, 460 N.W.2d 39, 47 n.4 (Minn. 1990).  Here, the plain language of the statute imposes a criminal penalty for breach of peer review confidentiality, but not a civil one.  Thus, a private cause of action does not exist for a violation of Minn. Stat. § 145.64.

Dr. Sherr argues that the peer review statutes support a civil cause of action if the unauthorized disclosure is motivated by malice.  This argument is based on Minn. Stat. § 145.63, subd. 1, which provides immunity to peer review participants for performance of their duties "unless the performance of such duty, function or activity was motivated by malice."  Minn. Stat.

§ 145.63, subd. 1.  Dr. Sherr's argument is misplaced.  The immunity provision of  § 145.63, subd. 1 does not address unauthorized disclosures of peer review information.  Rather, confidentiality of peer review information and the penalty for breaching such confidentiality are explicitly governed by Minn. Stat. §§ 145.64 and 145.66, respectively.  Under Minn. Stat. § 145.66, "[a]ny disclosure other than that authorized by section 145.64" is a misdemeanor, regardless of whether or not the disclosure was made with malice.  No other remedy is provided for unauthorized disclosures.  Thus, the immunity provision does not apply to breaches of peer review confidentiality.

Because the statutes governing confidentiality of peer review information do not provide a civil cause of action for unauthorized disclosures, Dr. Sherr's claim for breach of  peer review confidentiality under Minn. Stat. § 145.64 is dismissed for failure to state a claim.

## C.  Invasion of Privacy

Dr. Sherr asserts an invasion of privacy claim against the HealthEast Defendants, alleging that they publicized private facts from the peer review process by disclosing the facts to the "larger neurosurgery community."  FAC ¶ 106.  The HealthEast Defendants argue that Dr. Sherr's claim for common law invasion of privacy is not pled with particularity and fails to state a claim.

To state a claim for publication of private facts, a plaintiff must demonstrate that the defendant gave "publicity" to a matter concerning the plaintiff's private life and that "the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public."  Bodah v. Lakeville Motor Express, Inc., 663 N.W.2d 550, 553 (Minn. 2003) (quoting Lake v. Wal-Mart Stores, Inc., 582 N.W.2d 231, 233 (Minn. 1998)).

"Publicity" means that "the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Id. at 557 (citing Restatement (Second) of Torts § 652D cmt. a).  As the Restatement explains:

> it is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons. On the other hand, any publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or statement made in an address to a large audience, is sufficient to give publicity within the meaning of the term as it is used in this Section. The distinction, in other words, is one between private and public communication.

Id. at 554 (quoting Restatement (Second) of Torts § 652D cmt. a).

In Bodah, the Minnesota Supreme Court held that a defendant's fax of 204 employees' social security numbers to sixteen company managers in six different states "does not constitute publication to the public or to so large a number of persons that the matter must be regarded as substantially certain to become public."  Id. at 557-58.  The court thus dismissed the claim on the pleadings for failure to allege the requisite "publicity" to support a claim for invasion of privacy. Id. at 558.

Dr. Sherr has not alleged sufficient facts to satisfy the "publicity" requirement for an invasion of privacy claim.  The First Amended Complaint identifies only one individual—United Hospital's president Tom O'Connor—who allegedly learned of Dr. Sherr's suspension from the HealthEast Defendants.  The only other allegation that the HealthEast Defendants disclosed Dr. Sherr's suspension is made ""[u]pon information and belief" and alleges that the HealthEast Neuro Group communicated Dr. Sherr's suspension to Fairview Southdale.  Id. ¶ 83.  The Court

is not required to accept this allegation as true.  Although a few other individuals allegedly knew of Dr. Sherr's summary suspension within days after it was imposed, those individuals are not alleged to have learned the information from the HealthEast Defendants.  See, e.g., id. ¶ 77 (alleging Stryker Spine sales representative Doug Mackay was informed of the suspension by a coworker who, in turn, had learned of the suspension from the SCH neurosurgeons); ¶ 79 (alleging Defillo texted Dr. Sherr about rebuilding his career, but not specifically alleging that Defillo knew of the summary suspension or that he learned of it from the HealthEast Defendants).  Thus, the factual allegations in the First Amended Complaint do not support a reasonable inference that the HealthEast Defendants publicized the information "to the public or to so large a number of persons that the matter must be regarded as substantially certain to become public."  Bodah, 663 N.W.2d at 557–58.

Dr. Sherr also alleges that the HealthEast Defendants disclosed facts from the peer review process "to the larger neurosurgery community" consisting of "35–40 active practitioners in Minnesota," this bald conclusion is unsupported by factual allegations and does not sufficiently allege publicity.  See  FAC ¶¶ 38, 106; Bodah, 663 N.W.2d at 558 (citing Lewis v. Snap-On Tools Corp., 708 F. Supp. 1260, 1262 (M.D. Fla. 1989) ("The mere conclusory allegation that the alleged disclosure was to 'large numbers of persons' does not meet the requirement that the publication be to the general public.")).  In addition to its conclusory nature, the allegation that information was disseminated to a community of 35–40 individuals does not constitute publicity.  See, e.g., Cohen v. Beachside Two-I Homeowners' Ass'n, No. 05-706, 2005 WL 3088361, at *17 (D. Minn. Nov. 17, 2005) (holding that distribution to "a small community of about fifty households in a small geographic area" was not to the public at large).

Dr. Sherr cites a 1991 decision by the Wisconsin Court of Appeals to argue that even if the information is not communicated to the public at large, the publicity standard may nevertheless be satisfied if the information is shared within a smaller population that is particularly relevant to the plaintiff.  See Pl.'s Mem. Opp'n [Docket No. 35] 32–33 (citing Hillman v. Columbia Cty., 474 N.W. 2d 913 (Wis. Ct. App. 1991)).  Relying on this "relevant population" approach, Dr. Sherr contends that "so many people within the population relevant to Dr. Sherr were aware of his summary suspension that the matter can be substantially certain to be one of public knowledge."  Id. at 33.  However, the Minnesota Supreme Court has explicitly "reject[ed] the 'special relationship' or 'particular public' approach taken by some jurisdictions," and has decided "instead, to adopt the Restatement definition of 'publicity.'"  Bodah, 663 N.W. 2d at 556–57.  Under this definition, the matter must be "made public by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."  Id. at 557 (citing Restatement (Second) of Torts § 652D cmt. a).  As discussed above, the allegations in the First Amended Complaint do not satisfy this standard.

Dr. Sherr's claim for invasion of privacy is dismissed based for failure to state a claim.

**D.  Sherman Act, Section 1 (Count VII)**

Dr. Sherr asserts a claim under Section 1 of the Sherman Act, which prohibits a "contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  To establish a claim under Section 1 of the Sherman Act, a plaintiff must demonstrate that:  "(1) there was a contract, combination, or conspiracy; (2) the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis;

and (3) the restraint affected interstate commerce." <u>Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.</u>, 5 F. Supp. 2d 694, 703 (D. Minn. 1998). Dr. Sherr alleges that Defendants conspired to restrain his ability to participate in the St. Cloud and Twin Cities neurosurgery markets by making false negative peer reviews about his performance as a neurosurgeon, suspending his privileges at SJH, and improperly disclosing peer review confidential information, and that his exclusion from those markets unreasonably restrained trade by reducing the neurological care options open to patients. <u>Id.</u> ¶¶ 141–48.

### 1. Conspiracy

Turning to the first element of Sherr's Section 1 claim, Dr. Sherr alleges two levels of conspiracy: (1) intra-corporate conspiracies in which the corporate Defendants conspired with their own medical staff; and (2) a conspiracy among all Defendants. The Court addresses each in turn.

### a. Intra-corporate Conspiracy

Defendants argue that Dr. Sherr's allegations that the corporate Defendants conspired with their own physician employees fail as a matter of law under the intra-corporate immunity doctrine. This doctrine provides that "officers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy." <u>Copperweld Corp. v. Indep. Tube Corp.</u>, 467 U.S. 752, 769 (1984). This is because "[t]he officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals." <u>Id.</u> Here, the individual Defendants are all alleged to be employees of their respective health care entities. FAC ¶¶ 10–15. Thus, the immunity doctrine applies under the facts alleged.

Dr. Sherr argues that an exception to the intra-corporate immunity doctrine exists when members of a peer review committee have a personal stake in the outcome of the peer review process. However, "[t]o speak of a conspiracy among a medical staff during the peer review process is not very meaningful in antitrust terms if the staff lacks the final authority to implement any agreement it does reach." Oskanen v. Page Mem'l Hosp., 945 F.2d 696, 706 (4th Cir. 1991); accord Pudlo v. Adamski, 789 F. Supp. 247, 251–52 (N.D. Ill. 1992) (granting motion to dismiss claim under Section 1 of Sherman Act where hospital's governing board retained ultimate authority to terminate plaintiff and it was thus "inconceivable a conspiracy among individual members of the medical staff was the actual cause of [plaintiff's] injuries"). Based on the allegations in the First Amended Complaint, the individual Defendants lacked final authority to summarily suspend Dr. Sherr's HealthEast privileges. The ultimate decision rested with the MEC, which voted to approve Sherr's summary suspension on October 22, 2015. Therefore, Dr. Sherr has failed to plead a viable intra-corporate antitrust conspiracy.

### b. Conspiracy Among All Defendants

Defendants argue that Dr. Sherr has also failed to plead a conspiracy between the HealthEast and CentraCare Defendants. The Court agrees.

"In order to withstand a motion to dismiss, a plaintiff must go further than merely alleging a conspiracy existed, for a bare bones accusation of conspiracy without any supporting facts is insufficient to state an antitrust claim." Insignia Sys., Inc. v. News Corp., Ltd., No. 04-4213, 2005 WL 2063890, at *1 (D. Minn. Aug. 25, 2005). Here, Dr. Sherr conclusorily alleges "upon information and belief" that the CentraCare and HealthEast Defendants communicated orally and in writing about a scheme to force Dr. Sherr from practicing neurosurgery in

Minnesota by having his privileges terminated at SJH. FAC ¶¶ 46–47. Entirely lacking are factual allegations to explain why, how, or for what purpose HealthEast and CentraCare—who are not alleged to compete against each other—would need to conspire together to exclude Dr. Sherr from the market. See Am. Channel, LLC v. Time Warner Cable, Inc., No. 06-2175, 2007 WL 142173, at *7 (D. Minn. Jan. 17, 2007) (granting defendant's motion to dismiss Sherman Act Section 1 claim where plaintiff failed to allege "any facts to explain why, how, or for what purpose Time Warner and Comcast—who do not compete with one another—would need to conspire together" to exclude plaintiff's channel from their cable systems). "[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." Twombly, 550 U.S. at 557.

The allegations that the HealthEast Neuro Group demanded that HealthEast discontinue its use of MSBI physicians for neurosurgery, and that CentraCare's Defillo threatened St. Cloud physicians by stating that their practices would suffer if they continued to refer patients to Dr. Sherr, do not establish a plausible claim of conspiracy. "An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief." Id. (quotation marks and alterations omitted). Moreover, the allegations provide no economic motive for the CentraCare Defendants in a different city to conspire to have Dr. Sherr's privileges suspended at SJH, and give no economic motive for the HealthEast Defendants to include the CentraCare Defendants in their alleged conspiracy. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 596–97 (1986) ("[I]f petitioners had no rational economic motive to conspire, and if their

conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.").  The allegation that some of the individual Defendants had previously practiced together does not give rise to a plausible inference that Defendants had an economic motive to conspire.  Thus, Dr. Sherr's allegations do not sufficiently plead conspiracy to restrain trade.

## 2. Unreasonable Restraint of Trade

In addition to failing to plausibly allege a conspiracy, Dr. Sherr has not sufficiently alleged an unreasonable restraint on trade because he has not adequately alleged actual detrimental effects on the neurosurgery market, and because his allegations of a relevant geographic market are deficient as a matter of law.

"[A] restraint may be adjudged unreasonable either because it fits within a class of restraints that has been held to be 'per se' unreasonable, or because it violates what has come to be known as the 'Rule of Reason,' under which the test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it may suppress or even destroy competition.'" FTC v. In. Fed'n of Dentists, 476 U.S. 447, 457–58 (1986) (quoting Chicago Bd. of Trade v. United States, 246 U.S. 231, 238 (1918)).  The federal courts of appeals, including the Eighth Circuit, have "generally examined the denial or revocation of hospital privileges under the rule of reason."  Flegel v. Christian Hosp., Ne.-Nw., 4 F.3d 682, 686 (8th Cir. 1993).

In determining the legality of a restraint on trade under the rule of reason, courts focus on the detrimental effects to competition.  Id. at 688.  A plaintiff may demonstrate the potential for adverse effects on competition by (1) showing actual detrimental effects such as a reduction of output, or (2) defining the relevant market and considering a defendant's power within that

market.  <u>Minn. Ass'n of Nurse Anesthetists</u>, 5 F. Supp. 2d at 706–07 (citing <u>FTC</u>, 476 U.S. at 460–61).

### a.  Actual Detrimental Effects

"If a plaintiff demonstrates the existence of actual detrimental effects, formal market analysis is unnecessary."  <u>Id.</u> at 707.  Detrimental effects can include an increase in price, a decrease in output, or a decline in the quality of good or services.  <u>Id.</u>

Dr. Sherr argues that he has alleged detrimental effects by stating:  "neurosurgery patients in the Twin Cities and St. Cloud communities . . . who often face life-threatening and excruciatingly painful medical conditions with limited treatment options, have been deprived of Dr Sherr's innovative and expert care, and are instead forced to accept treatment from the . . . individually named physician Defendants, who have, individually and collectively, nowhere near the expertise and innovative skills and techniques Dr. Sherr brings to this critically needed area of medical care."  FAC ¶ 6.  This allegation does not allege a decrease in the output of services, because Dr. Sherr specifically alleges that patients are receiving treatment from the "individually named physician Defendants."  <u>Id.</u>  The allegation also fails to allege a decline in the quality of services, because the reference to Dr. Sherr's superior skills and expertise is conclusory and is without any factual support.  Broad, unsupported allegations of actual detrimental effects are inadequate to withstand a motion to dismiss.  <u>See</u> <u>Insignia Sys.. Inc.</u>, 2005 WL 2063890, at * 4. There is no allegation that the price of neurosurgery services has increased as a result of Dr. Sherr's departure from the market.  Thus, Dr. Sherr has not alleged the existence of actual anti-competitive effects.

### b.  Relevant Market

Because Dr. Sherr failed to allege actual detrimental effects, he must allege that

Defendants have market power in a well-defined relevant market. Flegel, 4 F.3d at 689; Double

D Spotting Serv., Inc. v. Supervalu, Inc., 136 F.3d 554, 560 (8th Cir. 1998). "Without a well-

defined relevant market, a court cannot determine the effect that an allegedly illegal act has on

competition." Little Rock Cardiology Clinic PA v. Baptist Health, 591 F.3d 591, 596 (8th Cir.

2009) (citing FTC v. Freeman Hosp., 69 F.3d 260, 270–71 (8th Cir. 1995)).

A relevant market has two components: a product market and a geographic market.

Bathke v. Casey's Gen. Stores, Inc., 64 F.3d 340, 345 (8th Cir. 1995). "The relevant product

market includes all reasonably interchangeable products." Double D Spotting Serv., 136 F.3d at

560. The relevant geographic market "includes the geographic area to which consumers can

practically seek alternative sources of the product, and it can be defined as the market area in

which the seller operates." Id. (quotation marks omitted).

Generally, "proper market definition can be determined only after a factual inquiry into

the commercial realities faced by consumers." Id. 136 F.3d at 560 (quoting Queen City Pizza,

Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997)). However, this rule does not

equate to "a per se prohibition against dismissal of antitrust claims for failure to plead a relevant

market under Fed. R. Civ. P. 12(b)(6)." Id. (quoting Queen City Pizza, 124 F.3d at 436). The

Eighth Circuit and district courts within the circuit consistently dismiss antitrust claims at the

pleading stage where a plaintiff fails to adequately allege a viable relevant market. See, e.g.,

Little Rock, 591 F.3d at 601; Double D Spotting Serv., 136 F.3d at 561; Am. Channel, 2007 WL

142173, at *9; Tri State Advanced Surgery Ctr., LLC v. Health Choice, LLC, No. 14-143, 2015

WL 1737410, at *7 (E.D. Ark. Apr. 16, 2015); Davies v. Genesis Med. Ctr., 994 F. Supp. 1078,

1101–02 (S.D. Ia. 1998); Ferguson Med. Grp., L.P. v. Mo. Delta Med. Ctr., No. 06-08, 2006 WL

2225454, at *5 (E.D. Mo. Aug. 2, 2006). As the Eighth Circuit has observed, "[g]iven the

unusually high cost of discovery in antitrust cases, the limited success of judicial supervision in checking discovery abuse, and the threat that discovery expense will push cost-conscious defendants to settle even anemic cases, the federal courts have been reasonably aggressive in weeding out meritless antitrust claims at the pleading stage." Insulate SB, Inc. v. Advanced Finishing Sys., Inc., 797 F.3d 538, 543 (8th Cir. 2015) (internal quotations, citations, and alterations omitted).

Defendants argue the First Amended Complaint fails to identify a relevant geographic market. The Court agrees. In the medical setting, the proper geographic market is the geographic area were "few patients leave and few patients enter." Little Rock, 591 F.3d at 598 (internal quotations and alterations omitted). The market for specialized or sophisticated medical services may encompass a broader geographic area than the market for general medical services. Davies, 994 F. Supp. at 1100. The First Amended Complaint alleges a "Twin Cities" market and a "St. Cloud" market without addressing the critical question of where consumers of neurosurgery services can reasonably turn for alternative care. See FAC ¶¶ 147–48. It is reasonable to assume that a significant number of Twin Cities and St. Cloud neurosurgery patients travel to the Mayo Clinic in Rochester, Minnesota, which is roughly a 75-mile drive from SJH in St. Paul and approximately a 150-mile drive from SCH in St. Cloud. The failure to consider the Mayo Clinic, a renowned neurosurgery provider, in delineating the geographic market ignores the commercial realities faced by neurosurgery patients. See, e.g., Davies, 994 F. Supp. at 1100–01 (finding plaintiffs' geographic market was too narrow as a matter of law where the complaint failed to consider the impact of a high quality hospital located 56 miles from the Quad Cities). Thus, the factual allegations in the First Amended Complaint do not adequately plead the existence of a relevant geographic market.

For the above reasons, the First Amended Complaint does not state a Section 1 antitrust claim.

**E.  Sherman Act, Section 2 (Count VIII)**

Defendants argue that Dr. Sherr's claim under Section 2 of the Sherman Act must be also dismissed for failure to properly allege a relevant market.

Section 2 of the Sherman Act makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."  15 U.S.C. § 2.  "Section 2 of the Sherman Act requires a plaintiff to plead and prove that the defendant (1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power as opposed to gaining it as a result of a superior product, business acumen, or historical accident."  Double D Spotting Serv., 136 F.3d at 560 (internal quotations omitted).  Thus, to state a Sherman Act claim under Section 2, the plaintiff must identify a valid relevant market.  Id.; Fed. Trade Comm'n v. Tenet Health Care Corp., 186 F.3d 1045, 1051 (8th Cir. 1999) ("Identifying a valid relevant market is a "necessary predicate to the finding of an antitrust violation.").

Dr. Sherr alleges that Defendants violated Section 2 of the Sherman Act by monopolizing or conspiring to monopolize the "St. Cloud market."  FAC ¶¶ 157–60.  This market definition is unsupportable on its face because Dr. Sherr's own allegations establish that he practiced in a geographic area larger than St. Cloud, maintaining privileges at five different hospitals in the Twin Cities.  See Flegel v. Christian Hosp. Ne.-Nw., 804 F. Supp. 1165, 1174 (E.D. Mo. 1992) (holding plaintiffs' proposed market definition "erroneous as a matter of law" because "Plaintiffs themselves practice and have staff privileges at hospitals in a geographic area that even extends beyond" the geographic market proposed by plaintiffs).  Thus, Dr. Sherr's claim under Section 2

of the Sherman Act is dismissed for failure to plead a relevant market.

**F. Minnesota Antitrust Statutes (Counts IX and X)**

Dr. Sherr also alleges violations of Minnesota antitrust law under Minn. Stat. §§ 325D.51 and 325D.52. See FAC ¶¶ 162–69. "Minnesota anti-trust law is interpreted consistent with the federal court's construction of the Sherman Act." Lamminen v. City of Cloquet, 987 F. Supp. 723, 734 (D. Minn. 1997) (citing State by Humphrey v. Rd. Constructors, Inc., 474 N.W.2d 224, 225 n.1 (Minn. Ct. App. 1991)); see also Lorix v. Crompton Corp., 736 N.W.2d 619, 626 (Minn. 2007) ("As the purposes of Minnesota and federal antitrust law are the same, it is sensible to interpret them consistently."). Thus, where the federal antitrust claims fail, the Minnesota antitrust claims must fail as well. Insulate, 797 F.3d at 547; Minn. Made Hockey, Inc. v. Minn. Hockey, Inc., 789 F. Supp. 2d 1133, 1141 n.2 (D. Minn. 2011). Because the Dr. Sherr's claims under Sections 1 and 2 of the Sherman Act are dismissed for failure to state a claim, his claims under Minnesota's antitrust statutes are also dismissed.

## IV. CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants HealthEast Care System, Dr. Margaret Wallenfriedman, Dr. Mary Beth Dunn, Dr. Richard Gregory, and Dr. Stephen Kolar's Motion for Partial Judgment on the Pleadings [Docket No. 24] is **GRANTED**;

2. Defendants CentraCare Health, Dr. Jerone D. Kennedy, and Archie Defillo's Motion for Judgment on the Pleadings [Docket No. 28] is **GRANTED**; and

3.      Counts I, II, VII, VIII, IX, and X of the First Amended Complaint [Docket No. 15] are **DISMISSED** with prejudice.

                              BY THE COURT:


                              _____s/Ann D. Montgomery_____
                              ANN D. MONTGOMERY
                              U.S. DISTRICT JUDGE

Dated:  June 30, 2017.