## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Dr. Gregory Sherr,

        Plaintiff,

    v.

HealthEast Care System,
Dr. Margaret Wallenfriedman, Dr. Mary Beth Dunn,
Dr. Richard Gregory, and Dr. Stephen Kolar,

        Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 16-3075 ADM/LIB

---

Lawrence P. Schaefer, Esq., Peter Christian, Esq., and Jean M. Boler, Esq., Schaefer Halleen, LLC, Minneapolis, MN, on behalf of Plaintiff.

Jaime Stilson, Esq., Meghan L. DesLauriers, Esq., and Daniel Falknor, Esq., Dorsey & Whitney LLP, Minneapolis, MN, on behalf of Defendants HealthEast Care System, Dr. Margaret Wallenfriedman, Dr. Mary Beth Dunn, Dr. Richard Gregory, and Dr. Stephen Kolar.

---

## I.  INTRODUCTION

On May 28, 2019,[1] the undersigned United States District Judge heard oral argument on

Defendants HealthEast Care System ("HealthEast"), Dr. Margaret Wallenfriedman ("Dr.

Wallenfriedman"), Dr. Mary Beth Dunn ("Dr. Dunn"), Dr. Richard Gregory ("Dr. Gregory"),

and Dr. Stephen Kolar's ("Dr. Kolar") (collectively, "Defendants") Motion for Summary

Judgment [Docket No. 84].  For the reasons discussed below, the Motion is granted.

## II.  BACKGROUND

Dr. Sherr, a neurosurgeon who previously maintained privileges at HealthEast's

hospitals, alleges HealthEast's in-house neurosurgeons sought to remove him as a competitor by

---

[1] The delay in issuing this Order is unusual for this Court and was caused by unanticipated intervening events.  The Court apologizes for its tardiness.

defaming his professional abilities and orchestrating a sham peer review process that resulted in a summary suspension.  First Am. Compl.  ("FAC") [Docket No. 15] ¶¶ 3, 48, 49, 54–73.  Although Dr. Sherr's summary suspension was later overturned by HealthEast's Judicial Review Committee, he alleges that word of his suspension destroyed his referral sources and forced him to move to another state to continue his career.  Id. ¶¶ 5, 89–90.

Dr. Sherr asserts claims for defamation, tortious interference with prospective economic advantage, and tortious interference with contract.[2]  FAC ¶¶ 112–139.  Defendants argue they are entitled to summary judgment on all claims because state and federal peer immunity statutes protect them from liability on claims stemming from the peer review process.  Further, Defendants argue the alleged defamatory statements made outside the peer review process are not actionable.

## A.  Defendants

HealthEast is a non-profit health care provider and hospital management company that owns four hospitals in Minnesota.  FAC ¶ 8.  Drs. Wallenfriedman, Dunn, and Gregory (collectively, the "HealthEast Neuro Group") are neurosurgeons who began working as in-house surgeons for HealthEast in July 2013.  Pl. Exs. 63, 112, 130.[3]  Their compensation structures are

---

[2] The First Amended Complaint also includes claims for breach of peer review confidentiality, invasion of privacy, and anti-trust violations.  See FAC ¶¶ 92–111, 140–169.  These claims were dismissed on June 30, 2017, when the Court granted Defendants' motion for partial judgment on the pleadings.  See Mem. Op. & Order [Docket No. 43].  The First Amended Complaint also names CentraCare Health and two CentraCare Health employees (the "CentraCare Defendants") as defendants.  The CentraCare Defendants were dismissed on March 14, 2019 pursuant to a Stipulation [Docket No. 80] filed with the Court.  See Order Partial Dismissal [Docket No. 82].

[3] Exhibits cited as "Pl. Ex." are exhibits to the Declaration of Lawrence P. Schaefer ("Schaefer Decl.") [Docket No. 121].  The exhibits were later refiled as unsealed and sealed

linked to the number of procedures they perform, and their employment contracts state that HealthEast patients requiring specialized medical services will be referred to specialists within the HealthEast system.  Pl. Ex. 63 at 9, 11–15; Pl. Ex. 112 at 9, 11–15; Pl. Ex. 130 at 9, 11–15.

Dr. Kolar is an internal medicine physician who served as HealthEast's Senior Vice President and Chief Medical Officer in 2015.  Schaefer Decl. Ex. A [Docket No. 121, Attach. 3] ("Kolar Dep.") at 11:23–12:16.

**B.  Dr. Sherr**

Dr. Sherr, who completed his residency in 2010, specializes in brain, spine, and peripheral nerve surgery.  Schaeffer Decl. Ex. A [Docket No. 121, Attach. 5] ("Sherr Dep.") at 15:7–18.  He developed a large referral source from primary care doctors in northern Minnesota, and estimates that he was ranked in the country's 95th percentile in productivity for neurosurgeons specializing in spine surgery.  Id. at 27:17–28:8.

In November 2014, Dr. Sherr entered into a one-year employment agreement with Midwest Spine Institute, L.L.C.  Def. Ex. 4.[4]  Upon hiring Dr. Sherr, the entity changed its name to Midwest Spine and Brain Institute ("MSBI") to reflect that its practice also included brain surgery.  Sherr Dep. at 26:8–12.  MSBI's president, Dr. Stefano Sinicropi ("Dr. Sinicropi") planned for Dr. Sherr to be a leader in building MSBI's neurosurgical program.  Schaeffer Decl. Ex. A [Docket No. 121, Attach. 6] ("Sinicropi Dep.") at 68:12–17.  The employment agreement provided that after 12 months, MSBI could "in its sole discretion consider whether to offer

---

exhibits at Docket Numbers 139 and 140, respectively.

[4] Unless otherwise noted, exhibits cited as "Def. Ex." are exhibits to the First Declaration of Jaime Stilson [Docket No. 88] ("First Stilson Decl.").  Sealed exhibits to the First Stilson Declaration are filed as Docket Numbers 89 through 117.

[Sherr] the opportunity to become an owner" of MSBI.  Def. Ex. 4 ¶ 1.3.

In January 2015, Dr. Sherr applied for clinical privileges to perform certain surgical procedures at HealthEast hospitals.  HealthEast granted Dr. Sherr temporary privileges on February 3, 2015, and full privileges on April 30, 2015.  Def. Ex. 5 at 6002, 6004.  Dr. Sherr also maintained privileges at several other Minnesota hospitals in 2015, including Allina, Fairview Southdale, Fairview Ridges, North Memorial, Maple Grove, Fairview Northland, Brainerd Hospital, and St. Cloud Hospital.  Def. Ex. 6 at 34:10–36:24; 42:18–43:6, 44:2–21.

## C.  HealthEast's Spine Council

HealthEast has a Spine Council that meets monthly to review issues related to HealthEast's spine care practice.  Pl. Ex. 106 ¶¶ 11.1, 11.4; Schaefer Decl. [Docket No. 121, Attach. 7] ("Sipple Dep.") at 57:6–14.  The Spine Council's members are neurosurgeons and spine surgeons who perform surgeries at HealthEast hospitals including the HealthEast Neuro Group, as well as surgeons employed by other healthcare entities such as MSBI and St. Croix Orthopedic who maintain medical privileges at HealthEast hospitals.  Pl. Ex. 106 ¶ 11.3; Def. Ex. 31.  In September 2014, Dr. Wallenfriedman became the chair of HealthEast's Spine Council after running unopposed for the position.  Def. Ex. 2 at 95:17–19, Def. Ex. 3.

Prior to Dr. Wallenfriedman becoming chair, the Spine Council began generating a Spine Quality Report that tracked the number of spine surgery patients who were readmitted with surgical site infection ("SSI") within 30 days of spine surgery at HealthEast hospitals.  Def. Ex. 9 at 00297.  The trends from the data for July through December of 2014 prompted the Spine Council to continue to generate the Spine Quality Report for January through June of 2015 as an ongoing quality improvement activity.  Id.; Def. Ex. 37 at 5188.

4

**D.  HealthEast's Peer Review Process**

The Spine Council also conducts peer review on spine care cases collected from HealthEast's Peer Review committee.  Wallenfriedman Dep. at 168:21–24; Def. Ex. 8 ("Peer Review Policy") at 6098.  Under HealthEast's Peer Review Policy, cases potentially requiring peer review are identified through the following sources:

- Electronic, database generated reports

- Logs or other Council/departmental specific reports

- Clinical Documentation and Resource staff referrals regarding patient events and quality concerns

- Referrals from internal sources such as physicians, nursing, Risk Management, or Administration

- Referrals from external sources, such as third party payors and Quality Improvement Organization(s), e.g., Stratis.

Peer Review Policy ¶ 3.  Once a case is selected for peer review, it is assigned to a practitioner reviewer to review the case and document their findings on a Peer Review Form.  Id. ¶ 5.

The Spine Council then holds a peer review committee meeting to discuss the cases.  Id. ¶¶ 6–7.  The Peer Review Policy states that the review chair "must facilitate the practitioner peer review committee meetings to ensure a fair and objective evaluation of individual practitioner performance and to ensure reasonable actions are taken based on assessment findings."  Id. ¶ 7. The review chair is authorized, but not required, to limit the attendance of clinical peers who may have anti-competitive motives in evaluating the individual being reviewed.  Id.

**E.  HealthEast's Bylaws**

HealthEast's bylaws set forth the conditions and procedures for summarily suspending a practitioner's clinical privileges.  See Pl. Ex. 106 ¶ 9.2.  The bylaws provide that "[w]henever a

practitioner's conduct requires that immediate action be taken to . . . reduce the substantial likelihood of immediate injury or damage to the health or safety of any patient . . . the Chief Executive Officer, or designee . . . shall have the authority to summarily suspend the . . . clinical privileges of such practitioner."  Id. ¶ 9.2.1.

**F.  HealthEast Neuro Group Displeased when Patients Referred to Dr. Sherr**

At the time Dr. Sherr obtained clinical privileges at HealthEast in 2015, Dr. Daniel Sipple ("Dr. Sipple") served as the director of HealthEast's Spine Center.  Sipple Dep. at 12:14–20, 22:17–19.[5]  In this role, Dr. Sipple referred HealthEast Spine Center patients to neurosurgeons.  Id. at 53:13–55:9.

Dr. Sipple preferred to refer HealthEast's complex spine cases to surgeons other than the HealthEast Neuro Group.  Id. at 27:8–11; 27:23–28:3; 60:1–14.  The HealthEast Neuro Group disagreed with Dr. Sipple's referrals of HealthEast patients to non-HealthEast spine surgeons. Id. at 53:4–8.  Dr. Dunn frequently raised the issue to Dr. Sipple in conversations and in phone messages, and once became upset with Dr. Sipple when he referred one of Dr. Wallenfriedman's patients to Dr. Sherr.  Id. at 11:15–12:10, 13:15–14:15, 17:5–18.  Dr. Sipple's referral of HealthEast patients to MSBI was also a "recurrent concern" with Dr. Wallenfriedman.  Schaefer Decl. [Docket No. 121, Attach. 9] ("Wallenfriedman Dep.") at 113:4–8.

Dr. Sipple testified in his deposition that the HealthEast Neuro Group berated him for referring cases to Dr. Sherr, saying the cases should not be referred to him because he was a "hack," "not a good surgeon," "asshole," "son of a bitch," and the "worst goddamn surgeon."

---

[5] Dr. Sipple is no longer at HealthEast and is now an MSBI employee.  Sipple Dep. 18:22–24, 21:4–8, 27:1–7; 128:8–12.

Sipple Dep. at 58:6–7, 62:24–63:4, 65:3–6, 124:13–20.  Similarly, Dr. Sherr testified that four members of the operating room staff told him that members of the HealthEast Neuro Group had said to them that Dr. Sherr is "not a good doctor," a "dangerous surgeon," and that he puts his patients at risk by "operating too quickly," "losing excessive amounts of blood during surgeries," and having "high infection rates."  Sherr Dep. at 83:2–84:14; 273:21–274:7, 275:13–277:23.

**G.  Operating Room Staff, Spine Quality Report Raise Concerns About Dr. Sherr**

In June 2015, HealthEast's operating room ("OR") staff raised concerns to HealthEast's Infection Prevention and Control ("IPC") department about the rates of infection, blood loss, and "redo procedures" for Dr. Sherr's surgical patients.  Def. Ex. 58.  The concerns were expressed to an IPC member at a June 10 meeting with OR staff, and were also conveyed to the IPC department in a June 11 email from nurse Annette Lund ("Nurse Lund"), an Infection Prevention Specialist.  Id.  Nurse Lund provided information on Dr. Sherr's infection rate from the past three months and stated that the SSI information, "along with the concerns of the OR staff are such that we would appreciate your input on this matter."  Id.

Concerns about Dr. Sherr's infection rate were also triggered by the Spine Quality Report,  which prompted the IPC department to send Dr. Sherr a letter on June 18, 2015 alerting him to his infection rate for spinal fusion surgeries.  Def. Ex. 10.  The letter stated that the Spine Quality Report showed Dr. Sherr had four spine surgical site infections from February through April 2015, and that "[f]or a point of reference, [HealthEast] had a total of 7 surgical site infections for spinal fusion procedures in 2014."  Id.

Dr. Sherr's patient care issues were again flagged on June 19, 2015, when Dr. Wallenfriedman sent an email to HealthEast's head of surgery, Dr. Andrew Fink ("Dr. Fink"),

providing him with a list of six patients who had experienced adverse events from surgeries performed by Dr. Sherr in April and May 2015.  Pl. Ex. 72.  Dr. Wallenfriedman testified in her deposition that the list was provided by OR nurse Connie McCook ("Nurse McCook") who gave Dr. Wallenfriedman a handwritten list of the patients and their adverse events.  Wallenfriedman Dep. 34:12–35:1, 41:23–42:7.  Nurse McCook related that safety event reports had been completed for some of these adverse events, and asked Dr. Wallenfriedman as chair of the Spine Council to follow up on the safety event reports to determine whether they had reached HealthEast's administration.  Id. at 36:1–3; 41:5–16; Def. Exs. 19, 20.  In addition to sending the initial June 19 email, Dr. Wallenfriedman sent Dr. Fink four additional emails from late June to early August providing the names and adverse events for four more of Dr. Sherr's surgical patients.  Pl. Ex. 74 at 1267–68.  Dr. Fink forwarded the lists to Dr. John Kvasnicka ("Dr. Kvasnicka") of HealthEast's Quality Department, and to nurse Ellen Fletcher ("Nurse Fletcher"), a Peer Review Specialist.  Pl. Ex. 72, Pl. Ex. 74 at 1267; Wallenfriedman Dep. at 36:18–24.

## H.  Peer Review Initiated for Dr. Sherr

Beginning in August 2015, HealthEast initiated a peer review process for Dr. Sherr that ultimately resulted in a review of eight of his cases.

### 1.  Two Cases Identified in Safety Event Reports

On August 7, 2015, Dr. Sherr was notified by letter that the Spine Council intended to conduct peer review of one of his cases.  Def. Ex. 11.  The case had been selected for review based on a safety event report documenting an injury to a patient's spinal cord.  Def. Ex. 19 at 0036, 0046–47.  The case was among those flagged by Nurse McCook and listed in Dr. Wallenfriedman's June 19, 2015 email to Dr. Fink.  Def. Ex. 11; Pl. Ex. 72.

On September 21, 2015, Dr. Sherr was notified of a second case being sent to peer review because of "concerns regarding large amount of intraoperative blood loss and postoperative infection." Def. Ex. 12. The case was selected for review based on a safety event report and a referral by HealthEast's Peer Review and Medical Director, Dr. Peter Tanghe ("Dr. Tanghe"). Def. Ex. 20. This case was also among those listed in Dr. Wallenfriedman's June 19 email to Dr. Fink. Def. Ex. 12; Pl. Ex. 72.

Dr. Sherr was notified that both cases would be discussed at a peer review meeting scheduled for October 6, 2015. On September 22, 2015, Nurse Fletcher, the Peer Review Specialist, sent an email to all members of the Spine Council, including physicians from MSBI, notifying them of the October 6 peer review meeting. Def. Ex. 14.

### 2. Six Cases Identified in Spine Quality Report

In the midst of Dr. Sherr's cases being selected for peer review, the Spine Council held its monthly meeting on September 1, 2015. Pl. Ex. 73. At the meeting, Dr. Wallenfriedman provided members with a summary of the data from the Spine Quality Report for January through June of 2015. Id. at 1350–52. The data showed that of the 14 unnamed surgeons tracked during this timeframe, one surgeon had six SSIs, whereas no other surgeon had more than two SSIs, and seven surgeons had zero. Id. at 1352. Further review for the outlier surgeon was requested, which identified the surgeon as Dr. Sherr. Def. Ex. 37 at 5188. Prior to the October 6 peer review meeting, Dr. Wallenfriedman shared the SSI data from the Spine Quality Report with HealthEast's CEO, who in turn asked Dr. Kolar to become involved. Kolar Dep. at 18:10–14, 19:3–25.

On October 2, the Spine Care Council held a peer review pre-meeting via conference call

9

that included Nurse Fletcher and Drs. Tanghe, Kvasnicka, Wallenfriedman, Kolar, and Fink.  Pl. Ex. 79.  Dr. Wallenfriedman stated during the call that the Spine Council intended to address the SSI outlier cases from the Spine Quality Report at the October 6 meeting.  Id. at 5220.  She requested clarification about whether these cases met the criteria for peer review.  Id.  Dr. Tanghe suggested that the infection cases could be addressed at a different meeting and that a "bigger picture of infection" was needed.  Id. at 5221.  Dr. Wallenfriedman responded that the Spine Council was under the impression that those cases would be assigned for peer review, and she was concerned that waiting to address the infections at a later meeting rather than on October 6 would be perceived as stalling.  Id.  Dr. Kvasnicka stated that if one in ten patients were being hurt, the cases should be reviewed within one week and a meeting should be held.  Id.  Drs. Fink and Kolar also felt that the cases needed to be addressed soon.  Id.  At Dr. Wallenfriedman's suggestion, it was determined that the six additional cases would be assigned to reviewers that day (October 2) and discussed at the October 6 meeting.  Id. at 5222–23.

On October 2, Dr. Tanghe sent Dr. Sherr an email notifying him that six additional cases would be discussed at the October 6 peer review meeting.  Def. Ex. 15.  In the email, Dr. Tanghe stated that the additional cases had been identified through the system-wide Spine Quality Report.  Id.  Four of the six additional cases had been listed in Dr. Wallenfriedman's emails to Dr. Fink.  Compare Pl. Ex. 74 at 1268 with Def. Exs. 17, 18, 21, 22.

Upon being notified of the six additional peer review cases, Dr. Sherr called MSBI's president, Dr. Sinicropi, to discuss the cases.  Sinicropi Dep. at 146:1–3.  Dr. Sinicropi asked Dr. Sherr whether he would be ready to address the added cases at the peer review meeting.  Id. at 146:19–20.  Dr. Sherr responded that he was prepared and was "very confident in his ability to

defend himself on those cases."  Id. at 146:15–22.  On October 5, Dr. Sherr submitted a written

response to each of cases to be discussed at the October 6 meeting.  Def. Ex. 26.

## I.  October 6 Peer Review Meeting

Pursuant to HealthEast's Peer Review Policy, the eight cases subject to peer review were

distributed to different members of the Spine Council for their review in advance of the peer

review meeting.  Def. Ex. 8 ¶ 5; Wallenfriedman Dep. at 154:15–155:15; Def. Exs. 24–25.  The

comments from the Peer Review Forms were then consolidated into case abstracts for the

meeting.  Def. Exs. 16–23.

Dr. Sherr attended the October 6 peer review meeting.  Two of his MSBI colleagues, Dr.

Glenn Buttermann ("Dr. Buttermann") and Dr. Sinicropi, were also present as members of the

Spine Council.  Def. Ex. 28.  At the meeting, Dr. Wallenfriedman presented a PowerPoint

summarization of the Spine Quality Report data from January through June 2015.  Def. Ex. 9.

The data showed that Dr. Sherr's infection rate was 9.8%, which was more than double that of

other surgeons.  Id. at 0300.  Dr. Sinicropi explained that although Dr. Sherr's infection rates

were higher than others, the rates must be considered in the context of the at-risk population Dr.

Sherr treated.  Dr. Sinicropi also stated that he was willing to develop an improvement plan for

Dr. Sherr to reduce the risk of future infections.  Sinicropi Dep. 165:6–166:24; Wallenfriedman

Dep. 215:17–24.  The Spine Council proposed recommended solutions, including mentoring Dr.

Sherr and monitoring his practice.  Pl. Ex. 85.  Due to time limitations, an additional meeting

was scheduled to further process the information.  Def. Ex. 30; Wallenfriedman Dep. 237:2–6.

Dr. Kolar, who was present at the October 6 meeting, testified in his deposition that he was "very

disturbed" by what he heard and had difficulty sleeping because he was worried that another

11

patient would be harmed.  Def. Ex. 32 at 16:10, 46:6–8.

## J.  October 20 Peer Review Meeting

On October 12, 2015, Dr. Tanghe directed Nurse Fletcher to send a notice for an October 20 follow-up peer review meeting to all attendees at the October 6 meeting except for Dr. Sherr. Def. Ex. 29.  Nurse Fletcher included MSBI surgeons Dr. Buttermann and Dr. Sinicropi on the email notice, but used a different email address for Dr. Sinicropi than was used for the October 6 meeting.  Pl. Ex. 103 at 6276.  The email address used by Nurse Fletcher had been provided to her by HealthEast's credentialing department, but turned out to be a nonexistent address.  Pl. Ex. 122 at 6615.  As a result, Dr. Sinicropi did not receive the email and did not attend the October 20 meeting.  Pl. Ex. 102.  Dr. Buttermann did receive the meeting notice but did not attend because he was in California for a family concern and was unable to participate by phone.  Id.

Eight of eleven Spine Council members attended the October 20 meeting.  Def. Ex. 31 at 5532.  No MSBI members were present.  Id.  Dr. Kolar perceived Dr. Sinicropi's absence as an indication that he "was voting with his feet" and had "cut loose Dr. Sherr."  Kolar Dep. 73:10–16.  The members discussed the peer review cases and issues of concern.  Def. Ex. 31.  At the conclusion of the discussion, the members in attendance voted by secret ballot unanimously in favor of suspending Dr. Sherr's privileges.  Id. at 5534.

## K.  Summary Suspension Imposed by Dr. Kolar

After the vote, Dr. Kolar immediately imposed a summary suspension of Dr. Sherr's privileges based on his concern for patient safety.  Def. Ex. 32 at 23:1–7; Def. Ex. 37 at 5187–88.  Dr. Kolar then notified Dr. Sherr that his medical privileges at HealthEast had been summarily suspended.  Def. Ex. 33.  Dr. Kolar explained that the suspension was made pursuant

to Section 9.2.1 of the HealthEast Medical Staff Bylaws, which authorizes summary suspension to "protect the life of any patient(s) or to reduce the substantial likelihood of immediate injury or damage to the health or safety of any patient."  Pl. Ex. 106 ¶ 9.2.1.

At the time he was notified of the summary suspension on October 20, Dr. Sherr was preparing for surgery at a HealthEast hospital and had to cancel the procedure. Def. Ex. 6 at 262:25–264:6.  As a result, operating room staff became aware that Dr. Sherr's privileges were suspended. Def. Ex. 35 at 31:17–32:1.  Word of Dr. Sherr's suspension quickly spread among hospital personnel and became common knowledge in the neurosurgery community.  Id. at 32:3–7; Schaefer Decl Ex. B [Docket No. 121, Attach. 10] ("O'Connor Decl.") ¶ 4.

Shortly after the October 20 meeting, Dr. Sinicropi emailed HealthEast stating that MSBI had not been notified of the meeting and that "[t]his is unacceptable and needs to be remedied." Pl. Ex. 102 at 6614.

**L.  Suspension Upheld by Medical Executive Committee**

On October 22, 2015, HealthEast's Medical Executive Committee ("MEC") met pursuant to HealthEast's bylaws to discuss Dr. Kolar's summary suspension of Dr. Sherr's privileges. Def. Ex. 37.  Dr. Sherr was asked to remain outside the room for the initial portion of the meeting.  Id. at 5187.

The discussion began with comments from Dr. Kolar, whom the MEC recognized as being the designee of HealthEast's CEO.  Id. at 5187.  Dr. Kolar explained that his reasons for imposing the summary suspension at the conclusion of the October 20 peer review meeting included "[s]ignificant outlier status with respect to surgical site infection rate," "[e]xcessive blood loss during surgery," and significant concern regarding patient selection.  Id. at 5188.  Dr.

Kolar informed the MEC that MSBI had proposed proctoring for Dr. Sherr, but that the Spine

Council concluded proctoring would not be sufficient.  Id.

Dr. Tanghe then discussed the Spine Quality Report.  Id.  Dr. Tanghe stated that the

blinded results from the Spine Quality Report showed an outlier surgeon with significantly more

infection cases than the other fifteen surgeons monitored on the report, and that the surgeon was

then identified as Dr. Sherr.  Id.

Dr. Wallenfriedman then presented a PowerPoint summary of Dr. Sherr's peer review

cases and the discussion at the October 20 peer review meeting.  Pl. Ex. 94.  The PowerPoint

presentation included a statement that all groups were invited to participate in the October 20

meeting, but that MSBI was not present.  Id. at 6462.  The MEC understood that MSBI was not

present because "one surgeon was unavailable and [for] the other surgeon there was a

miscommunication with his email."  Def. Ex. 37 at 5191.

Dr. Sherr was then invited to join the meeting and present his comments to the MEC.  Id.

at 5188–90.  He noted his objection to Dr. Wallenfriedman's presence based on her status as a

competitor.  Id. at 5189.  He also stated that his case load is more complex than other surgeons

operating at HealthEast, and his patient population is unique.  Id.  Dr. Sherr was then excused

from the room.  Id. at 5190.

After a period of deliberation, the members of the MEC voted 12 to 1 in favor of

upholding the suspension.  Id. at 5191.

## M.  Summary Suspension Overturned by Judicial Review Committee

On November 19, 2015, Dr. Sherr requested a hearing before HealthEast's Judicial

Review Committee ("JRC") regarding his summary suspension.  Def. Ex. 40.  A hearing was

held on February 1, 2016, and the JRC overturned the summary suspension on February 4, 2016. Def. Ex. 43.  In finding in favor of Dr. Sherr, the JRC stated that it "does not believe the evidence presented to the MEC could support a recommendation for summary suspension," because "certain statistical data, documentation of purported outlier status, speed of procedures and management were insufficient to support the MEC's decision." Id. at 1278–79.  The JRC noted that its decision "is not an endorsement of the medical care Dr. Sherr provided or his surgical competence." Id. at 1278.

Although Sherr's summary suspension was overturned, he chose not to reinstate his privileges and instead resigned his privileges at HealthEast on March 6, 2016.  Def. Exs. 44, 45.

**N.  Dr. Sherr Resigns from MSBI, Relocates his Practice to Florida**

In December 2015, while his summary suspension was still in effect, Dr. Sherr's employment contract with MSBI was renewed for an additional year.  Def. Ex. 27 at 115:6–20, 119:5–120:5; Def. Ex. 46.  MSBI was willing to support his efforts to continue practicing in this community.  Sinicropi Decl. ¶ 12.  Nevertheless, Dr. Sherr determined that his referral pattern had been destroyed and that he would not be able to generate enough income to satisfy his overhead costs at MSBI.  Sherr Dep. 130:5–7; 132:13–18.[6]  Dr. Sherr chose to relocate his practice to Florida.  Sinicropi Decl. ¶ 12.  Dr. Sherr resigned from MSBI effective March 31, 2016.  Id. ¶ 9.

---

[6] Dr. Sherr also testified in his deposition that he was in the final stages of negotiations with Allina's United Hospital for a subcontract to take United's emergency room call, but that United Hospital President Tom O'Connor ("O'Connor") told Dr. Sherr the subcontract could not be finalized because of Dr. Sherr's "reputation problem."  Sherr Dep. 66:12–18.  Although O'Connor has provided a Declaration in connection with Dr. Sherr's summary judgment motion, his Declaration does not include any statement to this effect.  See generally O'Connor Decl.

Also on March 31, 2016, Dr. Sherr entered into a five-year employment agreement with North Florida Surgical Associates, LLC ("North Florida") earning $52,000 per month.  Def. Ex. 47; Def. Ex. 6 at 197:10–12.  This was "significantly more" than the $10,000 per month draw he was receiving at MSBI.  Def. Ex. 6 at 197:13–15, 197:25–198:1.  North Florida offered Dr. Sherr a start date of April 1, 2016, but he chose not to start until July 1, 2016.  Id. at 196:2–5.  In 2017, Dr. Sherr earned approximately $750,000 at North Florida.  Id. at 198:15–21.  He is not required to pay overhead debt as he had at MSBI.  Id. at 198:22–24.

Dr. Sinicropi has averred in a Declaration that before the summary suspension, Dr. Sherr was a productive surgeon and was reasonably expected to become a partner at MSBI with an annual income ranging from $600,000 to $1 million.  Sinicropi Decl. ¶¶ 13–14.  Dr. Sherr testified in his deposition that had he become a partner at MSBI he would have earned $1.5 million.  Sherr Dep. at 197:15–24.

### III.  DISCUSSION

#### A.  Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in its favor.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  To withstand a motion for summary judgment, a plaintiff "must substantiate his

allegations with sufficient probative evidence that would permit a finding in his favor on more

than mere speculation, conjecture, or fantasy."  Moody v. St. Charles Cty., 23 F.3d 1410, 1412

(8th Cir. 1994) (internal quotation and alterations omitted).  The nonmoving party may not "rest

on mere allegations or denials, but must demonstrate on the record the existence of specific facts

which create a genuine issue for trial."  Krenik v. Cty. of Le Sueur, 47 F.3d 953, 957 (8th Cir.

1995) (internal quotation omitted).

**B.  Immunity Under Peer Review Statutes**

Defendants argue their peer review activities are immune from liability under Minnesota

and federal peer review statutes.

### 1.  Minnesota Peer Review Statute

Minnesota's peer review statute was designed to promote the strong public interest of

improving quality of medical care and to encourage the medical profession to police its activities

with minimal judicial interference.  Kalish v. Mount Sinai Hosp., 270 N.W. 2d 783, 785 (Minn.

1978); Campbell v. St. Mary's Hosp., 252 N.W.2d 581, 587 (Minn. 1977).  The statute provides

that "no person who is a member . . . of . . . a review organization shall be liable for damages or

other relief in any action brought by a person or persons whose activities have been or are being

scrutinized or reviewed by a review organization, by reason of the performance by the person of

any duty, function or activity of such review organization."  Minn. Stat. § 145.63, subd. 1.

Under the statute, immunity applies unless the peer review process was motivated by

malice toward the subject of the peer review inquiry.  Id.; In re Peer Review Action, 749 N.W.2d

822, 827 (Minn. Ct. App. 2008).  Malice is defined in the immunity context as "the intentional

doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful

violation of a known right." Peer Review, 749 N.W.2d at 827 (quoting Rico v. State, 472 N.W.2d 100, 107 (Minn. 1991)). Whether the peer review was motivated by malice is an objective inquiry that focuses on the process of the review rather than on what the reviewers subjectively believed. Id. at 828. Malice will be found only if the peer reviewers violate their own established procedures. Id. at 829.

Here, it cannot be genuinely disputed that HealthEast and the peer review committee followed its procedures and performed a procedurally fair process. First, the peer review process was initiated through normal channels. The process was triggered by two safety event reports which the HealthEast's Medical Director, Dr. Tanghe, determined merited review. Def. Exs. 11–12, 19–20. The six additional peer review cases were identified through the Spine Quality Report, which the Spine Council had been monitoring since June 2014, and which indisputably showed Dr. Sherr as an outlier of cases with SSI. Def. Ex. 9 at 3; Def. Ex. 37 at 5188.

Further, Dr. Sherr was adequately notified of the peer review proceedings. HealthEast notified Dr. Sherr of the peer review meetings and the cases to be discussed and provided him with an opportunity to respond orally and in writing. Def. Exs. 11–13, 15, 26.

Additionally, the cases were reviewed in compliance with HealthEast's Peer Review Policy. As required by the Policy, each of Dr. Sherr's cases was reviewed by a different Spine Council member.[7] Def. Ex. 8 ¶ 5; Def. Exs. 16–24. The Spine Council met twice to review and discuss Dr. Sherr's cases. Def. Ex. 31. In a secret ballot vote taken at the end of the second meeting, the eight Spine Council members in attendance voted unanimously in favor of

---

[7] One of the eight cases was assigned to Spine Council member Dr. Buttermann, an MSBI surgeon and Dr. Sherr's colleague. Def. Ex. 21. Dr. Buttermann did not complete the review of his assigned case. Id.

suspending Dr. Sherr's clinical privileges.  Def. Ex. 31.

Further, the summary suspension of Dr. Sherr's privileges was imposed pursuant to HealthEast's bylaws.  The bylaws authorized Dr. Kolar, as the CEO's designee, to impose the summary suspension based on a reasonable concern for patient safety.  Pl. Ex. 106 § 9.2.1; Def. Ex. 33.  Also in conformance with the bylaws, the MEC convened within five days of the summary suspension and affirmed the suspension by a vote of 12 to 1.  Pl. Ex. 106 § 9.2.4; Def. Ex. 37.

Lastly, Dr. Sherr was permitted to and did appeal his suspension to the JRC, consistent with § 10.2.1 of HealthEast's bylaws.  Pl. Ex. 106 § 10.2.1; Def. Ex. 40.  Because the peer reviewers followed established procedures and provided Dr. Sherr with a procedurally fair peer review process, there is no evidence the process was motivated by malice, and immunity thus applies.

Resisting this conclusion, Dr. Sherr argues that the peer review process was initiated outside of normal channels by Dr. Wallenfriedman, who alerted peer review personnel to Dr. Sherr's patient care issues.  The evidence indisputably shows otherwise.  Issues with Dr. Sherr's patient care were first flagged by OR staff and the IPC department, not Dr. Wallenfriedman.  On June 10 and 11, 2015, OR staff expressed concern to the IPC department about the infection rate, blood loss, and "redo procedures" for Dr Sherr's patients.  Def. Ex. 58.  The IPC department was also alerted to Dr. Sherr's high infection rate through the Spine Quality Report, which prompted the department to send Dr. Sherr a letter on June 18 advising him of this issue.  Def. Ex. 10.  Thus, by the time Dr. Wallenfriedman sent the June 19, 2015 email to Dr. Fink listing the adverse events for Dr. Sherr's patients—events that had been identified by Nurse McCook and

documented by safety event reports—Dr. Sherr's patient care issues were already known through other channels.  Peer review documentation also establishes that the cases selected for peer review were identified by two safety reports and the Spine Quality Report.  See Def. Exs. 16–23.  Thus, Dr. Sherr's contention that Dr. Wallenfriedman was the catalyst for the peer review investigation is not supported by the evidence.

To support his claim of procedural irregularities in the peer review process, Dr. Sherr contends that Dr. Wallenfriedman, a direct economic competitor of Dr. Sherr's, was permitted to continue to serve as chair of the Spine Council and influence every aspect of Dr. Sherr's peer review.  The state and federal peer review statutes "contain[] no provision barring competitors from participating in professional review activities."  Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 637 (3d Cir. 1996).  Nor does HealthEast's Peer Review Policy require economic competitors to abstain from peer review.  Rather, the Peer Review Policy states that a " review body chair may choose to limit medical staff attendance" if "[c]linical peers may have discriminatory or anti-competitive motives in evaluating the individual being reviewed."  Peer Review Policy ¶ 7 (emphasis added).

Not only was the Peer Review Policy followed, many physicians not affiliated with the HealthEast Neuro Group were involved in Dr. Sherr's peer review.  For example, the peer review cases were assigned to different Spine Council members, including Dr. Sherr's MSBI colleague Dr. Buttermann.  All eight of the Spine Council members present at the October 20 meeting recommended Dr. Sherr's suspension after concluding he posed a risk to patients.  The summary suspension was ultimately imposed by Dr. Kolar, who was not a neurosurgeon and not in competition with Dr. Sherr.  Twelve MEC members voted on October 22 to affirm the summary suspension.  Thus, Dr. Wallenfriedman's participation in the peer review process was

not a violation of HealthEast's procedures and does not raise a genuine issue of fact as to whether the peer review process was motivated by malice toward Dr. Sherr.[8]

Dr. Sherr also argues that HealthEast violated the Peer Review Policy's notice provisions by giving him only four days' notice that six additional cases would be discussed at the October 6 peer review meeting.  Dr. Sherr contends that Paragraph 6 of the Peer Review Policy requires notice of 10 business days to be given to a practitioner whose case will be discussed.  Paragraph 6 does not address the notice to be given to a practitioner.  Rather, this provision states that if the reviewer or committee determines a case should be discussed with a written response from the practitioner, the review body chair will notify the practitioner in writing of the upcoming case discussion, and "the practitioner must provide a written response or indicate they will attend the discussion within 10 business days of the receipt of the letter."  Peer Review Policy ¶ 6.

Even if Paragraph 6 of the Peer Review Policy could be construed as requiring the peer review committee to provide a practitioner with ten business days' notice that their case will be discussed, there is no evidence that Dr. Sherr alerted the peer review committee to the shortened notice period nor did he request additional time to respond.  To the contrary, it is undisputed that Dr. Sherr provided a written response to the additional cases being discussed and felt prepared and confident about defending those cases.  Def. Ex. 26; Def. Ex. 27 at 146:15–22.  Additionally, no decision was made on October 6, and the discussion was continued to October 20, eighteen days after Dr. Sherr received notice of the six additional peer review cases.  Dr. Sherr was also

---

[8] As evidence of malice, Dr. Sherr also argues that a HealthEast employee described Dr. Wallenfriedman in an April 2015 email as being on a "witch hunt" against Dr. Sherr.  Pl.'s Mem. Opp'n Summ. J. [Docket No. 120] at 41; Pl. Ex. 18 at 6729.  However, this purported evidence of Dr. Wallenfriedman's subjective frame of mind is not relevant to the malice inquiry.  Peer Review, 749 N.W.2d at 828 (stating malice is an objective inquiry).

permitted to present arguments to the MEC on October 22, twenty days after receiving notice. The notice given was adequate and is not evidence of malice.

Dr. Sherr also suggests that the email notice of the October 20 meeting was intentionally sent to an incorrect email address for Dr. Sinicropi.  There is no evidence that the HealthEast Neuro Group was involved in sending this email, or that the incorrect address was anything other than an administrative error.  Dr. Sherr also argues that Dr. Wallenfriedman's alleged statement during the October 20 meeting—that Dr. Sinicropi had been invited to the meeting but elected not to attend—was an attempt to convince Dr. Kolar to reject a proctoring plan and instead summarily suspend Dr. Sherr.  This argument fails because there is no evidence Dr. Wallenfriedman made this statement.[9]  Even if she had, Dr. Sinicropi did not alert HealthEast to the erroneous email address until after the October 20 meeting was over, and thus Dr. Wallenfriedman could not have known when making the statement that Dr. Sinicropi had not received the email notice of the meeting.  At the time the MEC voted to uphold Dr. Sherr's suspension, it was aware of the reasons why no one from MSBI had attended the October 20 meeting.  Def. Ex. 37 at 5191.

Dr. Sherr also contends that HealthEast failed to follow its own internal procedures because it "bypassed" the Focused Professional Practice Evaluation ("FPPE") and Ongoing Professional Practice Evaluation ("OPPE") processes for Dr. Sherr, and instead initiated a peer

---

[9] Dr. Sherr cites Dr. Wallenfriedman's deposition for his assertion that "Wallenfriedman falsely stated that Sinicropi had been invited but apparently elected not to attend."  Pl. Mem. Opp'n Summ. J. at 16 n.13 (citing Wallenfriedman Dep. at 216:6–217:24).  Dr. Wallenfriedman's testimony from this portion of her deposition is that she asked where the MSBI physicians were and decided to proceed with the meeting after being told that Drs. Sinicropi and Buttermann had been informed of the meeting.  Wallenfriedman Dep. at 216:6–217:24.

review process.  Pl.'s Mem. Opp'n Summ. J. at 40.  This argument lacks merit.  HealthEast

began the FPPE process for Dr. Sherr on February 3, 2015.  See Def. Ex. 60 [Docket No. 134];

Def. Ex. 61 [Docket No. 135].  In October 2015, as part of Dr. Sherr's FPPE process,

HealthEast's Ruth Nordquist sent Dr. Wallenfriedman a list of Dr. Sherr's cases, which Dr.

Wallenfriedman summarized and sent to Dr. Kolar.  Wallenfriedman Dep. at 171:17–25.  Thus,

HealthEast did not "bypass" the FPPE process.  The OPPE process, which begins after a

practitioner passes the FPPE process, was not initiated for Dr. Sherr because he was summarily

suspended before his FPPE process had been completed.  Id. at 177:1–22.

Because Dr. Sherr has not adduced evidence from which a reasonable jury could find that

the peer review process was motivated by malice, immunity under Minnesota's peer review

statute applies.  See Campbell, 252 N.W.2d at 587 (holding state law immunity applicable where

plaintiff's "unsubstantiated speculation as to the reasons for the revocation of his surgical

privileges" failed to meet the objective standard required to prove malice).

### 2.  Federal Immunity Statute

Even if state law immunity did not apply, Defendants are entitled to immunity under the

federal Health Care Quality Improvement Act ("HCQIA") for actions taken during peer review.

42 U.S.C. § 11111(a).  For immunity to apply under the HCQIA, the actions of a professional

review body such as HealthEast's peer review committee must be taken:

> (1) in the reasonable belief that the action was in the furtherance of
> quality health care,
>
> (2) after a reasonable effort to obtain the facts of the matter,
>
> (3) after adequate notice and hearing procedures are afforded to the
> physician involved or after such other procedures as are fair to the
> physician under the circumstances, and

> (4) in the reasonable belief that the action was warranted by the facts
> known after such reasonable effort to obtain facts and after meeting
> the requirement of paragraph (3).

42 U.S.C.§ 11112(a).  A professional review action shall be presumed to have met these four

criteria unless the presumption is rebutted by a preponderance of the evidence.  Id.; Sugarbaker

v. SSM Health Care, 190 F.3d 905, 912 (8th Cir. 1999).

Dr. Sherr has not satisfied his burden of producing evidence that would allow a

reasonable jury to conclude Defendants' peer review process failed to meet the requirements for

application of immunity under § 11112(a).  The first requirement, whether a professional review

action is taken "in the reasonable belief that the action was in furtherance of quality health care"

is an objective inquiry.  Sugarbaker, 190 F.3d at 913 (quoting 42 U.S.C. § 11112(a)(1)).  The

reviewers' subjective bias or bad faith is not relevant to the inquiry.  Id. at 914.  Here, the Spine

Council recommended suspension based on concerns with Dr. Sherr's infection rate, blood loss,

poor patient selection, serious and unusual complications from surgery, and patient safety.  Def.

Ex. 31.  Dr. Kolar imposed the suspension after learning of these medical concerns and

concluding that Dr. Sherr's continued practice was substantially likely to endanger patients.

Def. Ex. 23:1–8, 46:6–8.  The MEC affirmed the suspension after being similarly concerned with

Dr. Sherr's "complication rate," "patient selection criteria," and other issues.  Def. Ex. 37 at

5190.  Thus, the summary suspension was made in the reasonable belief that it would further the

quality of health care.

The second immunity requirement of § 11112(a) is also met because the Spine Council

made a reasonable effort to obtain the facts by distributing the cases for review among the Spine

Council members, discussing the cases at two meetings, and permitting Dr. Sherr to respond both

orally and in writing.  The fact-finding process also included a review hearing by the MEC and

an appellate level review by the JRC.

The third requirement is satisfied because the notice and hearing provisions of § 11112(a)(3) do not apply for summary suspensions imposed "where the failure to take such an action may result in an imminent danger to the health of any individual." 42 U.S.C. § 11112(c)(2). Here, Dr. Kolar imposed the suspension because he believed Dr. Sherr's continued practice represented a substantial likelihood of immediate injury to patients. Def. Ex. 32 at 23:1–7. Even if the notice and hearing provisions of § 11112(a)(3) applied, they were satisfied here because Dr. Sherr was afforded an opportunity to respond orally and in writing at the October 6 peer review meeting and he admitted he had sufficient time to prepare for the meeting. He was also permitted to respond weeks later at the MEC meeting on October 22 and in his appeal to the JRC. See Sugarbaker, 190 F.3d at 916 (holding presumption of adequate notice was not rebutted where doctor had "opportunity to respond" in an appeal).

The fourth requirement is also satisfied because HealthEast's peer review participants had a reasonable belief that the suspension was necessary based on known facts including Sherr's high infection rate and adverse events described in the safety event reports. Although the JRC later overturned the suspension, the JRC's disagreement with the conclusions of the Spine Council, Dr. Kolar, and the MEC "does not 'meet the burden of contradicting the existence of a reasonable belief that they were furthering health care quality in participating in the peer review process.'" Id. (quoting Brader v. Allegheny Gen. Hosp., 167 F.3d 832, 843 (3d Cir. 1999)); Lee v. Trinity Lutheran Hosp., 408 F.3d 1064, 1071 (8th Cir. 2005).

Because Dr. Sherr has not produced sufficient evidence to rebut the presumption that the above criteria were met, federal immunity applies and summary judgment is appropriate for Dr. Sherr's claims relating to the peer review process.

## C.  Defamation (Count III)

Dr. Sherr asserts a defamation claim against Defendants.  To establish a defamation claim under Minnesota law, a plaintiff must prove:  (1) the defamatory statement was communicated to someone other than the plaintiff, (2) the statement is false, and (3) the statement tends to harm the plaintiff's reputation and to lower the plaintiff in the estimation of the community.  Bahr v. Boise Cascade Corp., 766 N.W. 2d 910, 919–20 (Minn. 2009); Stuempges v. Parke, Davis & Co., 297 N.W.2d 252, 255 (Minn. 1980).  If the defamatory statement affects a plaintiff in their business or profession, it is defamation per se and thus is actionable without proof of actual damages.  Bahr, 766 N.W.2d at 920; Stuempges, 297 N.W.2d at 255.

### 1.  Statements Made During Peer Review

Defendants assert immunity from liability for statements made in peer review.  In the Amended Complaint, Dr. Sherr alleges that during peer review Drs. Wallenfriedman and Dunn raised concerns about "excessive blood loss" and the speed of his surgeries, and also that the HealthEast Neuro Group stated that Dr. Sherr failed to order necessary imaging for the eight patients at issue in the review.  Am. Compl. ¶¶ 58, 59, 62.  Defendants are not liable for these statements because peer review immunity applies.  See Lee, 408 F.3d at 1070 (affirming grant of summary judgment on defamation claim where federal immunity applied).

2. **Statements Made Outside of Peer Review**

a. **Statements Alleged in Complaint**

The Amended Complaint also alleges that prior to the peer review process, the HealthEast Neuro Group made disparaging remarks to operating room nurses about the speed of Dr. Sherr's surgeries, and Drs. Wallenfriedman and Dunn expressed concerns to operating room staff about excessive blood loss experienced by Dr. Sherr's patients during surgery. These alleged statements to the operating room staff are the only statements alleged to have been made outside the context of peer review.

The only evidence supporting these alleged pre-peer review statements is Dr. Sherr's deposition testimony. In his deposition, Dr. Sherr testified that four operating room nurses told him on multiple occasions in June and July of 2015 that Dr. Wallenfriedman said he operates too quickly. Sherr Dep. at 275:13–277:23. Dr. Sherr also testified that during this same time period Dr. Dunn stated to the four operating room nurses that Dr. Sherr's patients lose a liter of blood for every fusion surgery he performs. Id. at 83:5–23, 289:14–290:8.[10] Dr. Sherr was not present when these statements allegedly were made. Def. Ex. 6 at 89:21–23.

The unsworn statements by the four operating room nurses are multiple level

---

[10] Dr. Sherr also cites to the deposition testimony of Markus Carlson ("Carlson"), a member of HealthEast's operating staff, to support his assertion that the HealthEast Neuro Group made statements about excessive blood loss during Dr. Sherr's surgeries. See Pl. Mem. Opp'n Summ. J. at 8 (citing Carlson Dep. [Docket No. 121, Attach. 2] at 23:12–24). However, when asked whether any HealthEast Neuro Group made a comment about blood loss, Carlson replied: "I can't remember specifically surgeons, but I can definitely recall water cooler talk from my coworkers about that." Carlson Dep. at 23:12–19. When asked whether it was possible that the statements about excessive blood loss came from either Dr. Wallenfriedman, Dr. Dunn, or Dr. Gregory, Carlson merely answered: "It could be possible." Id. at 24:4–10. Carlson does not remember a surgeon making the statements, and the mere possibility that a member of the HealthEast Neuro Group could have made these statements does not create a genuine issue of material fact.

inadmissible hearsay.  The statements are being offered for the truth of the matter

asserted—namely, that members of the HealthEast Neuro Group made statements to operating

room staff about excessive blood loss and the speed of Dr. Sherr's surgeries.  See Fed. R. Evid.

801(c) (defining hearsay as a statement a "declarant does not make while testifying at the current

trial or hearing," and is offered in evidence "to prove the truth of the matter asserted").

Inadmissible hearsay evidence alone cannot defeat a summary judgment motion.  Firemen's

Fund Ins. Co. v. Thien, 8 F.3d 1307, 1310 (8th Cir. 1993).  Thus, Dr. Sherr's defamation claim

fails as to the only pre-peer review statements alleged in the Amended Complaint.  See LeBaron

v. Speedway SuperAmerica LLC, No. 05-1822, 2007 WL 107726, at *7 (D. Minn. Jan. 10, 2007)

(granting summary judgment on defamation claim where only proffered evidence was

inadmissible hearsay).

### b. Statements Not Alleged in Complaint

Defendants argue that the allegedly defamatory statements Dr. Sipple testified to in his

April 2018 deposition—namely, that members of the HealthEast Neuro Group said Dr. Sherr

was a "hack," "not a good surgeon," "not a good doctor," "asshole," "worst goddamn surgeon,"

and "son of a bitch"—were not alleged in the Amended Complaint and are thus beyond the

scope of Dr. Sherr's defamation claim.  Dr. Sherr argues the Court may consider the statements

because they were developed in discovery.[11]

---

[11] At the time Dr. Sherr responded to Defendants' summary judgment motion, he also
moved to amend the Amended Complaint to include the statements to which Dr. Sipple testified.
See Pl.'s Mot. Amend [Docket No. 124].  United States Magistrate Judge Leo I. Brisbois denied
the motion, finding that Dr. Sherr did not act diligently in seeking leave to amend because Dr.
Sherr had been aware of the factual basis for the additional allegedly defamatory statements
since at least April 2018, yet did not move for leave to amend until well after the February 1,
2019 deadline for filing nondispositive motions in this case.  See Order [Docket No. 146] at
8–11.

A claim for defamation must be pleaded with specificity, including who made the defamatory statements, to whom they were made, and where.  Pinto v. Internationale Set, Inc., 650 F. Supp. 306, 309 (D. Minn. 1986) (citing Asay v. Hallmark Cards, 594 F.2d 692, 698–99 (8th Cir. 1979)); Thompson v. Campbell, 845 F. Supp. 665, 679 (D. Minn. 1994) (stating "[a] defamation claim must be pled with a certain degree of specificity" and must "adequately identif[y] the false and defamatory statements as well as which defendants made the statements"); Moreno v. Crookston Times Printing Co., 610 N.W.2d 321, 326 (Minn. 2000) ("Minnesota law has generally required that in defamation suits, the defamatory matter be set out verbatim.").  One purpose of the specificity requirement for a claim of defamation is to provide sufficient specificity to put defendants on notice of what defamatory remarks he or she allegedly made.  Schibursky v. Int'l Bus. Machines Corp., 820 F. Supp. 1169, 1181 (D. Minn. 1993).

Here, the allegedly defamatory statements identified by Dr. Sipple are not set forth in the Amended Complaint and were not identified in Dr. Sherr's responses to interrogatories. Accordingly, the statements are beyond the scope of Dr. Sherr's defamation claim.  Dr. Sherr attempts to avoid this result by arguing that this Court previously held in Walker v. Wanner Engineering, Inc. that a defamatory statement need not be specifically alleged in a complaint if the statement is developed in discovery.  867 F. Supp. 2d 1050, 1056–57 (D. Minn. 2012).  Dr. Sherr misconstrues the holding in Walker.  In that case, the plaintiff did allege what statements were made, who made the statements, and to whom they were made, but did not allege where the statements were made.  Walker, 867 F. Supp. 2d at 1056.  The Court held that the defamation claims had been pled with sufficient specificity because "[a]lthough the 'where' is not expressly stated for either defamation claim, the context of both allegations put [the defendant] on notice that the defamatory statements were both made within [the defendant's] facility; this has been

explicated by deposition testimony." Id. at 1056–57.  Unlike the statements in Walker, the statements identified in Dr. Sipple's testimony were not alleged anywhere in the Amended Complaint, nor is it asserted who made the statements and to whom they were made.  Thus, the statements exceed the scope of Dr. Sherr's defamation claim asserted in the Amended Complaint.

Even if the statements identified in Dr. Sipple's deposition testimony fell within the scope of Dr. Sherr's defamation claim, they would not be actionable because they cannot be reasonably interpreted as stating actual facts.  The First Amendment protects expressions of opinion that cannot be reasonably interpreted as stating a fact and cannot be proven true or false. McKee v. Laurion, 825 N.W.2d 725, 733 (Minn. 2013); Kapoor v. Brown, No. 13-1402, 2014 WL 1516589, *4 (Minn. Ct. App. Apr. 21, 2014); French v. Eagle Nursing Home, Inc., 973 F. Supp. 870, 884 (D. Minn. 1997); Gacek v. Owens & Minor Distribution, Inc., 666 F.3d 1142, 1147 (8th Cir. 2012) (holding a statement is not actionable "if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise") (internal quotations omitted).  Thus, "an opinion amounting to mere vituperation and abuse or rhetorical hyperbole . . . cannot be the basis for a defamation action."  McKee, 825 N.W.2d at 733 (quotation omitted).  Whether a statement is an opinion or fact is a question of law.  Thomas v. United Steelworkers Local 1938, 743 F.3d 1134, 1142 (8th Cir. 2014).

Here, the statements allegedly made by members of the HealthEast Neuro Group that Dr. Sherr is a "hack," "not a good surgeon," "not a good doctor," "worst goddamn surgeon," "asshole," and "son of a bitch" are not precise or verifiable and cannot reasonably be interpreted as stating actual facts.  Thus, they are not actionable.  See, e.g., French, 973 F. Supp. at 884 (holding that defendant's statements that plaintiff was a "terrible nurse" and "shouldn't be

working" in nursing are not defamatory because the statements "cannot reasonably be interpreted as stating actual facts," are not precise or verifiable, and cannot be proven true or false).

Summary judgment is granted to Defendants on Dr. Sherr's defamation claims for all statements allegedly made by Defendants within and outside of peer review.

**D. Tortious Interference with Prospective Economic Advantage Claim (Count IV)**

Dr. Sherr asserts a claim for tortious interference with prospective economic advantage. He argues the summary suspension destroyed his opportunity to become a partner at MSBI, and also that the summary suspension prevented him from finalizing a business relationship with Allina's United Hospital.

To recover on a claim for tortious interference with prospective economic advantage, a plaintiff must prove:

> 1) The existence of a reasonable expectation of economic advantage;
>
> 2) Defendant's knowledge of that expectation of economic advantage;
>
> 3) That defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation;
>
> 4) That in the absence of the wrongful act of defendant, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and
>
> 5) That plaintiff sustained damages.

Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc., 844 N.W.2d 210, 219 (Minn. 2014).

Defendants are entitled to summary judgment because peer review immunity insulates them from liability for the summary suspension. Additionally, even if peer review immunity did

not apply, the claim for tortious interference with prospective economic advantage would fail because Dr. Sherr cannot show the suspension interfered with his prospective economic advantage with MSBI or Allina.

The summary suspension did not interfere with Dr. Sherr's prospective economic advantage with MSBI because Dr. Sherr voluntarily chose to resign from MSBI and move to Florida, where he earned $750,000 per year and was not required to pay overhead debt as he had at MSBI. See Hawkins v. DeRuyter, No. A03–1176, 2004 WL 1328008, at *2 (Minn. Ct. App. Jun. 15, 2004) (affirming summary judgment dismissal of claim for tortious interference with prospective employment relationship where plaintiff voluntarily terminated his employment relationship). It is undisputed that even after Dr. Sherr's suspension, MSBI extended his employment contract for a second year and was willing to support Dr. Sherr's efforts to continue practicing in this community.

Although Dr. Sherr argues that his referral sources were destroyed after his suspension became known in the neurosurgery community, he offers no such evidence from any referral source. Rather, he relies on the conclusory statements to this effect by Drs. Sinicropi and Buttermann. Additionally, Dr. Sherr made the decision to relocate to Florida less than two months after his summary suspension was reversed. At the time he left Minnesota, Dr. Sherr still maintained privileges at Allina, Fairview Southdale, Fairview Ridges, North Memorial, Maple Grove, Fairview Northland, Brainerd Hospital, and St. Cloud Hospital. These privileges were never revoked or suspended. Rather, Dr. Sherr voluntarily withdrew them when he moved to Florida. Because Dr. Sherr voluntarily resigned from MSBI, he cannot prove Defendants tortiously interfered with his prospective economic advantage with MSBI.

Regarding the prospective economic advantage with Allina, Dr. Sherr argues MSBI had

been negotiating a subcontract for Dr. Sherr to take call at Allina's United Hospital, but the negotiations fell through because O'Connor at United stated the environment had been poisoned by the suspension.  This argument relies on inadmissible hearsay.  O'Connor's Declaration does not include this statement.  Dr. Sherr voluntarily resigned his privileges with Allina when he moved to Florida.  Dr. Sherr has failed to adduce admissible evidence that Defendants tortiously interfered with his prospective economic advantage with Allina.  Defendants are entitled to summary judgment on Dr. Sherr's claim for tortious interference with prospective economic advantage.

**E.  Tortious Interference with Contract (Count V)**

Finally, Dr. Sherr asserts a claim for tortious interference with contract.  He argues the HealthEast Neuro Group interfered with two of his contractual relationships—his employment contract with MSBI and his relationship with HealthEast—by initiating a meritless peer review and effectuating his summary suspension.

A claim for tortious interference with contract has five elements:  "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages."  Sysdyne Corp. v. Rousslang, 860 N.W.2d 347, 351 (Minn. 2015).

Dr. Sherr's claim for tortious interference with a contract fails because peer review immunity protects Defendants from liability for the summary suspension.  Even if peer review did not apply, the claim lacks merit because Defendants' conduct did not cause Dr. Sherr to lose any contractual rights.  See Lee v. Metropolitan Airport Comm'n, 428 N.W.2d 815, 822 (Minn. Ct. App. 1988) (affirming summary judgment dismissal of interference with contract claim where appellant "failed to provide evidence that respondents' actions legally caused appellant to

lose any contractual rights").

With respect to his contractual relationship with MSBI, Dr. Sherr's employment contract was renewed in December 2015, while his privileges at HealthEast were still summarily suspended. As stated earlier, MSBI was willing to support Dr. Sherr's efforts to continue practicing in this community, but Dr. Sherr chose to voluntarily resign and relocate his practice to Florida. Dr. Sherr received all the compensation to which he was entitled under his employment contract with MSBI. Def. Ex. 27 at 113:20–115:1; Pl. Ex. 32 (showing excessive draw amounts paid to Dr. Sherr). Thus, Dr. Sherr "received everything which [he] had a contractual right to expect" from MSBI. Lee, 428 N.W.2d at 822.

As to his purported contractual relationship with HealthEast, Dr. Sherr cites no authority to support his assertion that his privileges to perform surgeries at HealthEast constituted a contractual relationship. Even if they had, a party cannot tortiously interfere with its own contract. Bouten v. Richard Miller Homes, 321 N.W.2d 895, 901 (Minn. 1982); French, 973 F. Supp. at 883. Defendants are entitled to summary judgment on Dr. Sherr's tortious interference with contract claim.

## IV.  CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendants HealthEast Care System, Dr. Margaret Wallenfriedman, Dr. Mary Beth Dunn, Dr. Richard Gregory, and Dr. Stephen Kolar's Motion for Summary Judgment [Docket No. 84] is **GRANTED**; and

2.    The First Amended Complaint [Docket No. 15] is **DISMISSED** with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  September 9, 2019.